IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 5:09-bk-76195 |
| NATIONAL HOME CENTERS, INC., | § | |
| | § | (CHAPTER 11) |
| DEBTOR. | § | |
| | § | |

### MOTION TO APPROVE BID AND SALES PROCEDURES AND NOTICE OF HEARING AND OPPORTUNITY TO OBJECT

National Home Centers, Inc. ("NHC" or the "Debtor"), hereby submits this motion (this "Motion") to Approve Bid and Sales Procedures for the Sale of Substantially All of the Debtor's Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and Assumption and Assignment of Executory Contracts and Non-Residential Real Property Leases, and Notice of Hearing and Opportunity to Object, as follows:

### I. JURISDICTION

1.  The Court has jurisdiction over this matter pursuant to 28 U,S.C. § 1334, This is a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U,S.C. § 1408 and 1409.

### II. BACKGROUND

2.  On December 8, 2009 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for reorganization relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtor continues to manage and operate its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On December 29, 2009, an official committee of unsecured creditors was appointed in this case.

854405-v1

3. NHC was founded in 1972 as a distributor and retailer of homebuilding materials to construction contractors, homebuilders and do-it-yourself consumers primarily in Arkansas, Oklahoma, Kansas and Missouri. NHC's product lines include appliances, home décor, dimensional lumber, hardware, doors, a wide variety of other construction and homebuilding materials, and furniture.

4. NHC operates retail home centers in Springdale, Russellville, Little Rock, Bentonville, North Little Rock, Conway, Fort Smith and Clarksville. A retail home center in Heber Springs was closed in June of 2009. NHC maintains its corporate office at 1106 N. Old Missouri Road in Springdale, Arkansas. NHC also operates retail flooring centers in Springdale and Conway. NHC presently employs approximately 514 people in Arkansas, approximately 321 of whom are hourly employees and 193 are salaried employees.

5. NHC's sales are conducted through building contractors and, although it maintains a solid reputation among its customer base, the nationwide decline in homebuilding activity has adversely affected the Debtor's operations. The U.S. Department of Housing and Urban Development, estimated that privately-owned building permits indicating future construction projects declined 47% from May, 2008 to May, 2009 and privately owned housing starts in May, 2009 were 45.2% below the May, 2008 levels. These market conditions substantially impacted NHC's sales. During the same period, credit markets providing NHC and related industry borrowers, including many of NHC's customers, with necessary revolving operating lines of credit have significantly tightened, and NHC's working capital has been significantly constricted.

6. The bankruptcy filing provides NHC with the platform necessary to reorganize and restructure its operations as a going concern in order continue its business operations,

maintain adequate working capital, minimize costs of the reorganization, protect the jobs of its employees and propose a plan of reorganization to pay its creditors.

7. The Debtor has determined that it is in the best interest of the estate to close its stores located in Bentonville, Clarksville, 13th Street in North Little Rock, and Little Rock (Chenal), Arkansas. The Debtor has also determined that it is in the best interests of the estate and its creditors to market the sale of its remaining assets (the "NHC Assets") as a going concern, pursuant to the procedure as set forth in this Motion.

8. Pursuant to the terms and conditions of that certain Fourth Joint Stipulation and Agreed Interim Order Authorizing the Use of Cash Collateral and Providing for Adequate Protection (the "Fourth Cash Collateral Order"),[1] the Debtor has agreed to file this Motion to approve bid and sales procedures for a sale of the NHC Assets free and clear of all liens, claims, encumbrances, and other interests, with the liens, claims, encumbrances, and other interests to attach to the sales proceeds therefrom and resulting in the full and indefeasible payment in cash at closing of all of the indebtedness owed (the "Agent Payoff") to JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "Agent") for itself and the other lenders under the Credit Agreement (the "Lenders").

### III. RELIEF REQUESTED

A. Proposed Bid Procedures

9. The Debtor proposes that the following solicitation process and bidding procedures (the "Bidding Procedures") be utilized in marketing, negotiating and consummating

---

[1] In the event that the Bidding Procedures (as defined below) or the Auction itself results in offers that are insufficient to maximize the value of the Debtor's assets, in the business judgment of the Debtor (with the concurrence of CRG, and after consultation with the Agent and the Lenders), then, notwithstanding the relief sought by the Debtor herein in this Motion, the Debtor shall proceed to take such actions consistent with the terms of the Fourth Cash Collateral Order and the Side Letter Agreement made a part thereof.

3

854405-v1

a sale of all or substantially all of the NHC Assets, and assumption and assignment of certain executory contracts and non-residential real property leases, free and clear of all liens, claims, encumbrances, and other interests, with all liens, claims, encumbrances and other interests to attach to the sales proceeds and resulting in the indefeasible payment in cash of the Agent Payoff to the Agent and the Lenders (the "Transaction"):

    a.    Within two (2) business days after the Bankruptcy Court's approval of these Bidding Procedures, the Debtor or its financial advisor, CRG Partners, L.L.C. ("CRG") will:

        i.    directly contact parties whom the Debtor or its advisors, in their sole discretion (with the input of CRG) deems appropriate (collectively, the "Interested Parties") regarding the Bidding Procedures and a proposed sale of the NHC Assets with respect to the Transaction.

        ii.    serve the following on the Interested Parties and all parties required to be served with such documents under the United States Bankruptcy Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") or any order of the Bankruptcy Court, including, without limitation, the most recent version of the Special Service list approved by the Bankruptcy Court:

            A.    the Bidding Procedures with any exhibits thereto;

            B.    the order of the Bankruptcy Court approving the Bidding Procedures or other notice relating to these Bidding Procedures;

            C.    a cover letter summarizing the Bidding Procedures and the Transaction and providing contact information for the Debtor and CRG to respond to inquiries regarding the Bidding Procedures and the Transaction; and

            D.    a summary of the business of NHC and the NHC Assets available for purchase pursuant to the Transaction.

    b.    Upon execution of a confidentiality agreement in form and substance acceptable to the Debtor, after consultation with CRG, and the sufficient demonstration by the Interested Party to the Debtor, in the Debtor's sole discretion (with the concurrence of CRG), that the Interested Party has the financial strength and ability to be a legitimate Bidder, the Interested Party shall be deemed a "Bidder" and shall be permitted to conduct reasonable due diligence.

4

c. Any Bidder that wishes to participate in the bidding process and make an offer (an "Offer") on the NHC Assets, pursuant to the terms of the Transaction, shall deliver a Letter of Intent to the Debtor at the following address:

Brent Hanby
Chief Financial Officer
National Home Centers, Inc.
1106 N. Old Missouri Road
P.O. Box 848
Springdale, AR 72765-0848
Email: bhanby@nhci.com

with copies to:

CRG Partners, L.L.C.
c/o Dan Dixon
13355 Noel Road, Suite 1825
Dallas, TX 75240
email: dan.dixon@crgpartners.com

-and-

Charles T. Coleman
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
email: ccoleman@wlj.com

Each Letter of Intent must be received by the above-listed parties **no later than 5:00 p.m. (Central Standard Time) on February 5, 2010** (the "Letter of Intent Deadline"). All Bidders who timely submit a Letter of Intent shall be deemed to have read, understood, consented to and agreed to be bound by these Bidding Procedures and the provisions of the Order approving these Bidding Procedures and any other orders relating to the Transaction.

d. **On or before February 19, 2010**, the Debtor and CRG will negotiate and finalize a "stalking horse" agreement (the "Stalking Horse Agreement"), with the Bidder who timely submitted to the Debtor the Letter of Intent that the Debtor in its sole discretion (with the concurrence of CRG), and after consultation with the Agent and the Lenders, determines represents the highest and best offer for the NHC Assets, which purchase price provides for the payment in cash at closing to the Debtor and which will result in the full and indefeasible payment of the Agent Payoff to the Agent and the Lenders. The Stalking Horse Agreement will provide for the Section 363 sale

of the NHC Assets to the stalking horse buyer (the "Stalking Horse"), free and clear of all liens, claims, encumbrances and interests, subject to higher and better bids as set forth herein, with the cash purchase price to be paid at closing, and the liens, claims, encumbrances and other interests to attach to the sales proceeds and which will result in the full and indefeasible payment of the Agent Payoff to the Agent and the Lenders.

      e.     Within three (3) days after the Debtor and Stalking Horse have executed the Stalking Horse Agreement, the Debtor shall file a motion, on an expedited basis, to approve the Stalking Horse Agreement and the sale of all or substantially all of the NHC Assets, pursuant to §363(b) of the Bankruptcy Code, with the assumption and assignment of certain executory contracts and non-residential real property leases (the "Sales Motion") and serve the Sales Motion together with a Notice of Hearing Date (the "Hearing Date"), and setting forth the Bid Deadline for Competing Offers on all Interested Parties, all parties who previously submitted a Letter of Intent and any other individual or entity who the Debtor believes may be a viable buyer for the NHC Assets. The Sales Motion shall seek a waiver of any stays under the Bankruptcy Code and the Bankruptcy Rules for "cause." The Sales Motion, together with a Notice of Hearing Date, shall also be served upon all creditors and parties in interest, or as otherwise ordered by the Court.

      f.     Upon the filing of the Sales Motion, any entity may submit a Competing Offer to the Stalking Horse Agreement **no later than 5:00 p.m. CST, five (5) business days prior to the Hearing Date (the "Bid Deadline")**. The Notice of Hearing Date shall set forth the date of the Bid Deadline.

      g.     The Debtor shall provide to the Agent and the Lenders, together with counsel to the Creditors' Committee, regular telephonic reports of all sales efforts, expressions of interest, and offers received, and shall provide such parties with copies of all offers and letters of intent.

      h.     In order to make a "Qualified Competing Offer," a Bidder must submit to the Debtor a Competing Offer that, at a minimum, complies with the following requirements, in the Debtor's sole discretion (subject to the concurrence of CRG and after consultation with the Agent and the Lenders) and the Debtor has the right to waive any of following requirements in its sole discretion (subject to the concurrence of CRG and after consultation with the Agent and the Lenders):

          i.     the Competing Offer must be received by the parties identified in subparagraph 9(c) above as of the Bid Deadline;

          ii.     the Competing Offer must be in writing and include all material terms and conditions of the Stalking Horse Agreement;

          iii.     the Competing Offer must fully disclose the identity of each entity that will be bidding for the NHC Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

6

  iv. the Competing Offer must specify which executory contracts of the Debtor are to be assumed by the Debtor and assigned to such Bidder (any and all payments required to cure such contracts under Section 365 of the Bankruptcy Code shall be paid out of the purchase price proceeds);

  v. the Bidder must provide written confirmation that it has completed its due diligence by providing a Notice of Completion of Due Diligence in connection with the Bidder's Competing Offer;

  vi. the Bidder must offer to close on the Transaction **not later than five (5) business days after the Bankruptcy Court enters an Order approving the sale of the NHC Assets, and by no later than April 2, 2010**;

  vii. the Competing Offer must not be conditioned on the Bidder's ability to obtain financing or the outcome of any uncompleted or unperformed due diligence;

  viii. the Bidder must provide the Debtor with sufficient and adequate information to demonstrate, to the sole and absolute satisfaction of the Debtor, that such Bidder has a financial commitment and the ability to consummate the Transaction, to operate the business of NHC and meet the requirements under 11 U.S.C. § 365 for the assumption and assignment of those leases and contracts that are included as part of the NHC Assets;

  ix. provides that all cash and securities that are components of the purchase price are denominated in U.S. dollars only;

  x. if the Bidder proposes to fund the purchase through third party lenders or funding sources, the Bidder must identify those sources and provide details regarding what conditions, if any, remain to be satisfied before such funds will be available to complete the Transaction; and

  xi. the Competing Offer must not be subject to the approval of any third party, including without limitation, the Bidder's board of directors or any other internal approval body.

  xii the Competing Offer must be accompanied by a good faith deposit (the "Good Faith Deposit"), payable to the order of the Debtor, in an amount equal to $500,000. Each Good Faith Deposit shall be by sent by wire transfer to the trust account of the Closing Agent to be identified (the "Escrow Agent") so that is received not later than 3:00 p.m. on the day of the Bid Deadline. Bidders should contact the Debtor's counsel or the Escrow Agent for wiring instructions to the Escrow Agent's trust account. If the wire transfer has not been received by 3:00 p.m. the day of the Bid Deadline, the Competing Offer does not meet the requirements for a Qualifying Competing Offer. The Good Faith Deposit shall be held by the Escrow Agent in an escrow account (the "Escrow Account'.") together with any interest earned thereon.

  xiii. the purchase price in the Competing Offer must exceed the cash purchase price set forth in the Stalking Horse Agreement by an amount equal to

7

the sum of the Break Up Fee of $250,000 and the initial bidding increment of $150,000. The Debtor and CRG, after consultation with the Agent and the Lenders, shall analyze each Competing Offer to calculate the respective value of each Competing Offer to the bankruptcy estate and determine whether each Competing Offer satisfies the minimum consideration requirements.

xiv. the Competing Offer must remain open and be binding and irrevocable, notwithstanding the Bankruptcy Court's approval of the sale of the NHC Assets to the Stalking Horse or the Successful Bidder, as the case may be, through consummation of the sale.

xv. the Competing Offer must acknowledge that the Bidder has had (i) sufficient and reasonable access to the Debtors' books, records and other information for the purposes of conducting due diligence, and (ii) an opportunity to conduct such due diligence.

i. All due diligence must be completed by the close of business on the Bid Deadline. The Debtor, in its sole discretion (with the concurrence of CRG), shall coordinate the efforts of Bidders in conducting their respective due diligence investigations regarding the Debtors and the NHC Assets.

j. The Debtor, in its sole discretion (with the concurrence of CRG and after consultation with the Agent and the Lenders) will evaluate any Competing Offers and will announce which, if any, of the Competing Offers constitute Qualified Competing Bids at or before the Auction. The Stalking Horse's bid pursuant to the Stalking Horse Agreement is automatically deemed to be a Qualified Competing Bid.

k. The Debtor and CRG shall be entitled to due diligence from any party (the "Qualified Bidder") that is determined by the Debtor to have submitted a Qualified Competing Bid, upon the Debtor's execution of a confidentiality agreement. A Qualified Bidder is expected to comply with all reasonable requests for additional information and due diligence access by the Debtor or CRG. Failure by a Qualified Bidder to fully comply with request for additional information and due diligence access will be a sufficient basis for the Debtor to reject or disqualify for consideration a Qualified Competing Offer.

l. If more than one Qualified Competing Offer is received by the Bid Deadline, the Debtor will conduct an auction (the "Auction") with respect to the NHC Assets at a time to be determined by the Debtor and served on the Qualified Bidders. **The Auction shall be conducted three (3) business days before the day set for the hearing on the Sales Motion**, at the offices of Wright, Lindsey & Jennings LLP, 903 North 47th Street, Suite 101, Rogers, Arkansas or at another date, time or place to be determined by the Debtor and noticed to the Qualified Bidders. If no Qualified Competing Bid is received, the Debtor shall have no obligation to conduct an Auction.

m. Only the Stalking Horse and the other Qualified Bidders will be entitled to make bids at the Auction.

8

854405-v1

  n. Prior to the commencement of the Auction, the Debtor will notify all Qualified Bidders who have submitted Qualified Competing Offers of the general terms of the highest and best Qualified Competing Offer received by the Debtor on or before the Bid Deadline.

  o. Prior to the commencement of the Auction, the Debtor may adopt rules for the Auction that, in its business judgment (and with the concurrence of CRG and after consultation with the Agent and the Lenders) will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Order approving these Bidding Procedures nor inconsistent with the obligations of the Debtor set forth in the Fourth Cash Collateral Order and will notify all Qualified Bidders who have submitted Qualified Competing Offers of such rules. All such rules will provide that:

    i. the procedures must be fair and open, with Qualified Competing Offers of such Qualified Bidders and bids made at the Auction (the "Auction Bids") being treated in substantially the same manner, to the extent reasonably possible;

    ii. all Auction Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder shall be fully disclosed to all other Qualified Bidders and that all material terms of each Auction Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction consistent with the terms of the Transaction; and

    iii. unless otherwise agreed to by the Debtor, no Qualified Bidder will be permitted more than twenty minutes to respond to the previous bid at the Auction.

  p. During the Auction, bidding shall begin initially with the highest Qualified Competing Offer, as determined solely by the Debtor, and subsequently continue in minimum increments of at least $50,000.00 higher than the previous bid, or such lesser increment as the Debtor, in its sole discretion (with the input of CRG), deems appropriate (the "Minimum Increment"). The Debtor and CRG shall analyze each Auction Bid to calculate its respective value to the bankruptcy estate and determine (with the concurrence of CRG and after consultation with the Agent and the Lenders) whether each Auction Bid satisfies the Minimum Increment requirements.

  q. The Auction will continue until no other Qualified Bidder wishes to make an Auction Bid in an amount greater than the previous Auction Bid.

  r. Immediately prior to the conclusion of the Auction, the Debtor, in its business judgment and in its sole discretion (but subject to the terms set forth below) shall:

854405-v1

    i. review each Qualified Competing Offer and or Auction Bid on the basis of its financial and contractual terms and the factors relevant to the sale process and the best interests of the Debtor's estate, including, without limitation, those factors affecting the speed and certainty of consummating the Transaction, resulting in the Agent Payoff;

    ii. determine and identify the highest or otherwise best offer in the Auction, consistent with these Bidding Procedures. The highest and best Qualified Competing Offer or Auction Bid as determined by the Debtor in its sole discretion (subject to the input of CRG and the proviso immediately below, and after consultation with the Agent and the Lenders) shall be deemed to be the "Successful Bid." and the holder of the Successful Bid shall be deemed the "Successful Bidder"); provided, however, in the event that the Debtor is not in concurrence with the judgment of CRG as to the highest and best Qualified Competing Offer or Auction Bid, then the Debtor, CRG, the Agent and the Lenders shall immediately caucus among themselves to understand the Debtor's business rationale and the reasons why there is no such consensus, with the Debtor's business judgment governing but the Agent and the Lenders reserving their rights to object to the Debtor's judgment as to the highest and best Qualified Competing Offer or Auction Bid; and

    iii. identify the next highest or otherwise best offer after the Successful Bid (the "Next Best Bid"), with the input of CRG (but subject to the proviso immediately below) and after consultation with the Agent and the Lenders; provided, however, in the event that the Debtor is not in concurrence with the judgment of CRG as to the next highest or otherwise best offer after the Successful Bid, then the Debtor, CRG, the Agent and the Lenders shall immediately caucus among themselves to understand the Debtor's business rationale and the reasons why there is no such consensus, with the Debtor's business judgment governing but the Agent and the Lenders reserving their rights to object to the Debtor's judgment as to the next highest or otherwise best offer after the Successful Bid.

  s. The Debtor may, in its business judgment and in its sole discretion (with the concurrence of CRG and after consultation with the Agent and the Lenders), reject at any time before entry of an order approving the Successful Bid and the Next Best Bid any bid that in the Debtor's sole discretion (with the concurrence of CRG and after consultation with the Agent and the Lenders) is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures or the terms and conditions of the Stalking Horse Agreement; or (iii) contrary to the best interests of the Debtor and its estate.

  t. Immediately prior to the adjournment of the Auction, the Successful Bidder, if it has not already done so, shall complete and sign all agreement(s),

**10**

854405-v1

contact(s), instruments(s) or other document(s) evidencing and containing the terms and conditions upon which such bid was made.

  u.  The Debtor shall present the results of the Auction to the Bankruptcy Court at a hearing to immediately following the close of the Auction, at which the Debtor will request that the Bankruptcy Court make certain findings regarding the Auction including:

    i.  that the Debtor conducted the Auction and selected the Successful Bid and the Next Best Bid in accordance with these Bidding Procedures;

    ii.  that the Auction was fair in substance and procedure;

    iii.  that the Successful Bid constitutes the highest and best offer for the NHC Assets, resulting in the Agent Payoff to the Agent and the Lenders; and

    iv.  that the Next Best Bid constitutes the next highest and best offer for the NHC Assets, resulting in the Agent Payoff to the Agent and the Lenders.

  v.  If no other Qualified Competing Offer is received, the bid of the Stalking Horse shall be deemed the Successful Bid, and it shall be deemed the Successful Bidder, subject to approval of the Bankruptcy Court and the right of the Debtor in subparagraph (r) above to reject any offer pursuant to the provisions of that paragraph.

  w.  Notwithstanding anything to the contrary in these Bidding Procedures, in the event that the Agent and the Lenders (or any special entity that is an affiliate of the Agent or the Lenders specially formed for the purpose of effecting a credit bid, if any, the "Credit Bidder") opt to submit a credit bid under Section 363(k) of the Bankruptcy Code for the NHC Assets (a "Credit Bid"), such Credit Bid must be higher than the Successful Bidder from the Auction, duly authorized, and received by the Debtor in advance of the Sale Hearing. Notwithstanding this deadline, the Agent and the Lenders are not waiving their rights to credit bid pursuant to Section 363(k) at a later time should this process fail.

  x.  At the Sale Hearing, the Debtor shall present the Successful Bidder or the Credit Bid to the Bankruptcy Court for approval. The Debtor's presentation to the Bankruptcy Court for approval of a particular Successful Bid shall not be deemed the Debtor's acceptance of such bid. The Debtor will be deemed to have accepted a Qualified Competing Offer only when such Bid has been approved by the Bankruptcy Court at a hearing to approve the sale of NHC Assets (the "Sale Hearing").

  y.  Notwithstanding the approval of the Successful Bid and the Next Best Bid, the consummation of the Transaction shall be contingent upon, and made pursuant

11

854405-v1

to an order of the Bankruptcy Court approving the transaction pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006.

z.  The Orders of the Bankruptcy Court granting the Sale Motion (with the assumption and assignment of certain executory contracts and non-residential real property leases) shall provide that if the Successful Bidder fails to consummate the Transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtor shall be authorized, but not required, to close with the Qualified Bidder that submitted the Next Best Bid, without notice to any other party (other than parties to executory contracts and unexpired leases affected by the Next Best Bid) or further Order of the Bankruptcy Court.

aa.  All Good Faith Deposits shall be subject to the jurisdiction of the Bankruptcy Court and shall be returned, together with any interest earned thereon, to such party within five (5) business days following the Closing Date, provided that such party has not been chosen as the Successful Bidder. If for any reason the Successful Bidder fails to close the Transaction, the Successful Bidder's Good Faith Deposit shall immediately and irrevocably become property of the Debtor's estates without any further action of the Bankruptcy Court, and the Debtor specifically reserves the right to seek all additional available damages from and/or remedies against the defaulting Successful Bidder. Likewise, the Debtor may seek such damages and remedies and shall be entitled to the Good Faith Deposit of any Qualifying Bidder selected by the Debtor as the Next Best Bid if such Qualifying Bidder fails to close because of a breach or failure to perform by that Qualified Bidder. The Good Faith Deposit of the Successful Bidder, together with any interest earned thereon, shall, in the event the Successful Bidder closes, be applied against the purchase price of the NHC Assets. The Successful Bidder shall not have any claim, cause of action, or any similar right against the Debtor relating to or arising out of the investment of the Successful Bidder's Good Faith Deposit.

bb.  All Good Faith Deposits shall be held, subject to the provisions of this Order, by the Escrow Agent in an escrow account. In the event of a dispute concerning the Debtor's right to retain any Good Faith Deposit of a bidder, the bidder's sole remedy shall be to seek relief from the Bankruptcy Court to compel the return of the Good Faith Deposit; provided, however, that nothing in this Order shall waive, release or restrict any right or remedy of any person arising from the wrongful disbursement or loss of any Good Faith Deposit.

cc.  Except as otherwise provided with respect to the Stalking Horse (and solely as part of the Break-Up Fee) or as otherwise ordered by the Bankruptcy Court, no Bidder shall be entitled to assert a substantial contribution claim against the Debtor's estate or otherwise seek reimbursement of its costs, expenses or professional fees incurred in connection with the sale and competitive bidding process for the NHC Assets, including formulation and submission of any bid or any due diligence efforts. All Bidders (other than the Stalking Horse), whether or not such Bidders are deemed to

have made a Qualified Competing Offer, shall indemnify the Debtor's bankruptcy estate and the Debtor for any claims by a broker or individual asserting a claim for commission or brokerage fees other than the Stalking Horse.

dd. The Debtor reserves the right, in its sole discretion (with the concurrence of CRG and after consultation with the Agent and the Lenders), to (i) impose at or before the Auction such other and additional terms and conditions as may be in the interests of the Debtor's estate and creditors (so long as such terms are not materially inconsistent with the terms of this Order and the Agreement); (ii) extend the deadlines set forth in this Order; (iii) adjourn the Auction at or before the Auction; (iv) adjourn the Sale Hearing.

ee. In the event that the Debtor, with Bankruptcy Court approval, accepts an offer for the NHC Assets from a bidder other than the Stalking Horse and consummates the sale of the NHC Assets to such party, the Debtor will pay the Stalking Horse a Break-Up Fee, in the amount of $250,000. Likewise, the Stalking Horse shall be entitled to the return of its Good Faith Deposit on the terms and conditions set out in the Stalking Horse Agreement notwithstanding the terms and conditions of the Bidding Procedures as approved by the Bankruptcy Court.

10. The Stalking Horse likely will expend, considerable time, money and energy pursuing the sale, and has engaged in extended arm's length and good faith negotiations. In recognition of this expenditure of time, energy and resources, and of the benefits of securing a "stalking horse," the Debtor has agreed to provide certain bidding protections to the Stalking Horse. Specifically, if the Debtor accepts an Competing Offer from a third party and closes such transaction with the third party, the Stalking Horse shall be entitled to receive from the Debtor a Break-Up Fee of $250,000 within three (3) days after the Closing Date.

11. The Debtor believes that the Bidding Procedures are in the best interests of the estate, are consistent with the Debtor's business judgment, and should be approved.

IV. PROPOSED BIDDING PROCEDURES AND PROTECTIONS ARE APPROPRIATE

12. Historically, courts have approved bidding procedures similar to the preceding procedures proposed by the Debtor under the "business judgment" rule. *E.g., In re Castre,*

*Inc., 312. B.R, 426, 428* (Bankr. D. Colo. 2004); *In re: Crowthers McCall Pattern, Inc., B.R. 877, 888* (Banks. S.D.N.Y. 1990). Courts have approved procedures requiring competing bids to be made in specific bidding increments, as proposed above. *E.g., Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 271* (2ns Cir. 1997) (approving overbid requirement of $650,000 on initial bid of $7.5 million); *Vista. Del Mar Assocs., Inc. v. West Coast Land Bank (In re Vista Del Mar Assocs., Inc.), 181 B.R. 422, 423* (B.A.P. 9th Cir. 1905) (approving overbid increment of $50,000 for property valued at $3.5 million).

13. The proposed Bidding Procedures are consistent with the foregoing precedents and are within the scope of the Debtor's responsibilities. Equally the Bidding Procedures will encourage potential purchasers to invest the time, energy, and resources necessary to submit qualified bids and yield the maximum value for the NHC Assets. Given the Debtor's efforts thus far to market such assets and to provide sufficient information to those parties who have expressed an interest in bidding and have initiated their due diligence efforts, approval of the Bidding Procedures is clearly in the best interests of the Debtor's bankruptcy estate.

14. Consistent with these precedents, the Bidding Procedures require any Competing Offer for the NHC Assets to be in an amount of at least $400,000 greater than the purchase price set forth in the Stalking Horse Agreement and any subsequent bid to be in an amount of at least $50,000.00 higher than the previous bid and the Break-Up Fee. Such a minimum initial overbid is necessary not only to compensate the Debtor for the risk assumed in foregoing a known, willing and able purchaser for a new potential acquirer, but also to ensure that there is an increase in the net proceeds received by the bankruptcy estates after deducting

the Break-Up Fee to be paid to the Stalking Horse in the event of a prevailing higher bid and a closing of such Transaction to a party other than the Stalking Horse.

15. Break-up fees are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code. Break-up fees encourage bidding by "establish[ing] a bid standard or minimum for other bidders to follow ... or attract[ing] additional bidders." *Official Comm. of Subordinated Bondholders v, Integrated Resources, Inc. (In re Integrated Resources, Inc.)* 147 B.R. 650, 662 (S.D.N.Y. 1992). Specifically, "[b]reakup fees and other strategies may `be legitimately necessary to convince a "white knight" to enter the bidding by providing some form of compensation for the risks it is undertaking."' *In re 995 Fifth Avenue Assocs., LP.*, 96 B.R. 24; 28 (Bankr. S.D.N.Y. 1989) (quoting *Sanajens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 624 (S.D.N.Y. 1987)); see also *In re Hupp Indus., Inc,* 140 B,R. 191, 194 (Bankr, N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's (i.e. `stalking horse's') due diligence"). Although the bankruptcy estates bear the cost of the Break-Up Fee in the event that the Stalking Horse is not the approved Successful Bidder, that expense is essentially paid by the Successful Bidder because its bid proposal must be worth enough to bring in more value to the estate than the Stalking Horse's initial bid, net of the Break-Up Fee.

16. As the court in *Integrated Resources* noted, "A break-up fee should constitute a fair and reasonable percentage of the proposed 'purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are

15

generally permissible."' 147 B.R. at 662 (quoting *995 Fifth Avenue, 96 B.R. at 28*), Such break-up fees, and any other bidding incentives, are given the benefit of the business judgment rule, and are presumed to have been made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Global Crossing Ltd., 295 B.R. 726, 743* (Baffler, S,D.N.Y. 2003), citing *Integrated Resources, 147 S.R. at 656*.

17. The amount of the proposed Break-Up Fee is fair and reasonable under the circumstances, and is well within the range of fees typically paid in a bankruptcy setting. See, e.g., *Consumer News & Business Channel P'ship v. Financial News Network, Inc. (In re Financial News Network, Inc.), 980 F.2d 165, 167* (2d Cir. 1992) (approving an $8.2 million break-up fee on a $149.3 million transaction); *Integrated Resources, 147 B.R. at 662*.

18. Here, the proposed Bidding Procedures, including the overbid protections and the Break-Up: Fee, are reasonable, appropriate, and within the Debtor's sound business judgment. They enable the Debtor to ensure the sale of the NHC Assets to a contractually committed bidder at a fair price while, at the same time, providing the Debtor with the potential of even greater benefit to the estate. Thus, the Bidding Protections should be approved.

19. Notice of this motion has been given to: (a) the Office of the United States Trustee; (b) counsel to the Creditors Committee; (c) all secured creditors; (d) upon those parties that requested notice of pleadings pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (e) upon all parties listed on Debtors' current Special Service List. In light of the nature of the relief requested, the Selling Debtors submit that no further notice is required for entry of the Bidding Procedures Order and request that the Bidding Procedures

Order be entered immediately subject only to the approval of the U.S. Trustee, counsel for the Creditor's Committee and counsel for J.P Morgan Chase Bank as lender and agent.

## V. NOTICE OF HEARING AND TIME TO OBJECT

A HEARING WILL BE HELD ON THIS MOTION **ON FEBRUARY 10, 2010 AT 9:00 A.M.** BEFORE THE HONORABLE BEN T. BARRY AT THE U.S. FEDERAL BUILDING, 35 E. MOUNTAIN ST., 4TH FLOOR, ROOM 416, FAYETTEVILLE, ARKANSAS 72701. OBJECTIONS TO THE BID PROCEDURES OR OTHER RELIEF SOUGHT HEREIN MUST BE FILED AND SERVED ON THE UNDERSIGNED COUNSEL FOR THE DEBTOR **NO LATER THAN 5:00 P.M. ON FEBRUARY 9, 2010** AND COUNSEL TO THE AGENT: David Weitman, Esq., K&L Gates LLP, 1717 Main Street, Suite 2800, Dallas, Texas 75201, david.weitman@klgates.com; Fax: 214.939.5849.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto authorizing and approving notice of the Bidding Procedures and Auction as set forth herein and granting such other relief as may be just and proper.

                                         WRIGHT, LINDSEY & JENNINGS LLP
                                         200 West Capitol Avenue, Suite 2300
                                         Little Rock, AR 72201
                                         Telephone: 501-371-0808
                                         Fax:       501-376-9442
                                         Email: ccoleman@wlj.com
                                                  jhenry@wlj.com
                                                  ktucker@wlj.com

By: _____
                                         Charles T. Coleman (80030)
                                         Judy Simmons Henry (84069)
                                         Kimberly Wood Tucker (83175)
                                         Attorneys for National Home Centers, Inc.

854405-v1

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing was sent via CM/ECF transmission and/or regular U.S. Mail, postage prepaid, to the parties listed on the Special Service List Dated January 11, 2010 [Docket No. 175] this 19th day of January, 2010.

Charles T. Coleman

854405-v1