IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 5:09-bk-76195 |
| NATIONAL HOME CENTERS, INC., | § | |
| | § | (CHAPTER 11) |
| DEBTOR. | § | |
| | § | |

**MOTION FOR APPROVAL OF (A) SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR TO THE STALKING HORSE BUYER, SUBJECT TO HIGHER AND BETTER OFFERS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND NON-RESIDENTIAL REAL PROPERTY LEASES; (C) CURE AMOUNTS AND PROCEDURES WITH RESPECT TO SAME; AND (D) GRANTING RELATED RELIEF; AND NOTICE OF BID DEADLINE; AUCTION DATE AND HEARING**

National Home Centers, Inc. ("NHC" or the "Debtor"), hereby submits this motion (the "Sale Motion") for approval of (i) the sale of substantially all of the Debtor's assets (the "Sale") to the Stalking Horse Buyer (as defined below), subject to higher and better offers, free and clear of all liens, claims, encumbrances, and other interests, (ii) assumption and assignment of certain executory contracts and non-residential real property leases, and (iii) cure amounts and procedures with respect to same, and the Debtor hereby alleges as follows:

**I.**
**JURISDICTION AND VENUE**

1.     The Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334 and 157. These matters concern the administration of these bankruptcy estates; accordingly, the matters are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 363 and 365.

860125

## II.
## BACKGROUND

**The Debtor**

2.      On December 8, 2009 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for reorganization relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtor continues to manage and operate its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On December 29, 2009, an official committee of unsecured creditors was appointed in this case.

3.      The Debtor was founded in 1972 as a distributor and retailer of homebuilding materials to construction contractors, homebuilders and do-it-yourself consumers primarily in Arkansas, Oklahoma, Kansas and Missouri. The Debtor's product lines include appliances, home décor, dimensional lumber, hardware, doors, a wide variety of other construction and homebuilding materials, and furniture.

4.      The Debtor's sales are conducted through building contractors and, although Debtor maintains a solid reputation among its customer base, the nationwide decline in homebuilding activity has adversely affected Debtor's operations. The U.S. Department of Housing and Urban Development, estimated that privately-owned building permits indicating future construction projects declined 47% from May, 2008 to May, 2009 and privately owned housing starts in May, 2009 were 45.2% below the May, 2008 levels. These market conditions substantially impacted NHC's sales. During the same period, credit markets providing NHC and related industry borrowers, including many of the Debtor's customers, with necessary revolving

operating lines of credit have significantly tightened, and the Debtor's working capital has been significantly constricted.

5.     At the time this case was filed, the Debtor operated retail home centers in Springdale, Russellville, Little Rock, Bentonville, North Little Rock, Conway, Fort Smith and Clarksville, Arkansas and retail flooring centers in Springdale and Conway. A retail home center in Heber Springs was closed in June of 2009. The Debtor is in the process of closing its stores in Bentonville, Little Rock and Clarksville. Pursuant to an order entered on February 2, 2010, [Docket No. 289] Store Closing Sales at those locations were authorized by the Court and are continuing as of this date.

### Revolving Credit Facility

6.     On August 12, 2004, the Debtor entered into a secured credit agreement (the "Credit Agreement") with JPMorgan Chase Bank (the "Agent") as Administrative Agent on behalf of itself and other lenders (the "Lenders"). The Credit Agreement has been amended from time to time through the Eighth Amendment dated November 30, 2009. The Credit Agreement, together with amendments, provided the Debtor with a revolving credit facility (the "Credit Facility"). As of the Petition Date, the aggregate amount owed under the Credit Facility was approximately $11,959,192.67, exclusive of additional pre-petition interest, attorneys' fees, costs, and expenses and other costs chargeable under the Credit Agreement (collectively, the "Agent Indebtedness"). To secure the repayment of the Agent Indebtedness and the obligations of the Debtor under the Credit Agreement and other related loan documents (collectively, the "Loan Documents"), the Debtor granted to the Agent and the Lenders first-priority security interests in and liens on substantially all of the assets of the Debtor (with the exception of various motor

vehicles and equipment), and including without limitation, inventory, receivables, certain real property, cash and proceeds of the foregoing. The Credit Facility is fully secured. In addition, by reason of the various cash collateral orders entered in this case, and by reason of the Debtor's use of the cash collateral of the Agent and the Lenders, the Agent and the Lenders were granted replacement liens and security interests on the "Additional Collateral" as defined in the Fourth Cash Collateral Order (as defined below).

**Equipment Financing**

7.      On August 26, 2008, the Debtor executed a Promissory Note (the "Liberty Note") in the original principal amount of $4,500,000 payable to Liberty Bank of Arkansas ("Liberty"). To secure the repayment of the Liberty Note, the Debtor entered into a Commercial Security Agreement dated August 26, 2009 (the "Liberty Agreement"), granting Liberty a security interest in all of Debtor's equipment and various motor vehicles together with accessions thereto and proceeds thereof.   As of the Petition Date, the amount owed under the Liberty Note was approximately $3,059,218.49.

8.      The Debtor also financed the acquisition of certain equipment pursuant to Master Lease Agreements (the "Capital Leases") with Citicorp Vendor Finance, Inc., now held by CIT Technology Financing Services, Inc. ("CIT") and Banc of America Leasing & Capital LLC ("BOA"). The Debtor's records reflect that CIT was owed $55,179.33 as of the Petition Date; however, CIT has filed a proof of claim in the amount of $42,614.33. The Debtor's records reflect that as of the Petition Date, BOA was owed the sum of $288,335.42, by virtue of the Schedule to the Master Lease Agreement, dated August 3, 2006, and the sum of $162,486.49 for

the equipment financed pursuant to the Schedule to the Master Lease Agreement dated November 27, 2006.

### The Sale Efforts and Sales Procedures

9.       Pursuant to the terms and conditions of the Fourth Joint Stipulation and Agreed Interim Order Authorizing the Use of Cash Collateral and Providing for Adequate Protection (the "Fourth Cash Collateral Order")[Docket No. 233], the Debtor agreed to and the Court approved certain procedures for the sale of substantially all of its assets, free and clear of all liens, claims, encumbrances, and other interests, with the liens, claims, encumbrances, and other interests to attach to the sales proceeds therefrom and resulting in the full and indefeasible payment in cash at closing of all of the indebtedness owed by the Debtor to the Agent and the Lenders.

10.      Specifically, the Fourth Cash Collateral Order required the Debtor to proceed as follows:

(1)      **Beginning on or before January 11, 2010** and continuing thereafter, the Debtor and the Financial Advisor shall set up a virtual data room, identify strategic and financial buyers for the Debtor's assets and business, circulate to prospective purchasers confidentiality agreements, and solicit offers to acquire the Debtor's assets pursuant to a Section 363 sale transaction, which would provide at closing for the full and indefeasible payment in cash of all of the indebtedness owing to the Agent and the Lenders; in addition, the Debtor and the Financial Advisor shall conduct such activities as more fully set forth in the side letter agreement, dated January 11, 2010, by and among the Debtor, the Agent and the Lenders;

(2)      **On or before January 18, 2010**, the Debtor and the Financial Advisor shall circulate to the Agent and the Lenders a summary memorandum detailing the opportunity for bidders to acquire the Debtor's assets, and setting forth the process for the proposed Section 363 sale of the Debtor's assets to a third party purchaser, which memorandum shall be reasonably acceptable to the Agent and the Lenders and shall be consistent with the terms set forth in the Fourth Cash Collateral Order (emphasis added);

(3)      **On or before January 19, 2010**, the Debtor shall file with the Bankruptcy Court, a Section 363 bid procedures motion (the "Bid Procedures Motion", which motion and order thereto (the "Bid Procedures Order") shall be

consistent with the Debtor's obligation to sell the Debtor's assets free and clear of all liens, with the purchase price to be paid at closing in cash resulting in the full and indefeasible payment in cash of all of the indebtedness owing to the Agent and the Lenders. **The Bid Procedures Motion was set for hearing on February 10, 2010.** Each of the Bid Procedures Motion and the Bid Procedures Order, the Sale Motion, and the order thereon (the "Sale Order") shall be consistent with the terms set forth herein, and the Debtor and the Financial Advisor shall use their best efforts to prepare each of the foregoing pleadings in form and substance reasonably and substantially acceptable to the Agent and the Lenders (emphasis added);

(4)     On or before February 5, 2010, the Debtor and the Financial Advisor shall have collected all letters of intent from the prospective purchasers of the Debtor's assets and shared all such information with the Agent and the Lenders;

(5)     **On or before February 19, 2010,** the Debtor and the Financial Advisor shall negotiate and finalize the "stalking horse" agreement, providing for the Section 363 sale of the Debtor's assets to the stalking horse buyer, free and clear of all liens, claims, and encumbrances, subject to higher and better bids, with the cash purchase price to be paid at closing to the Agent and the Lenders in an amount providing for the indefeasible payment in cash in full of the indebtedness owing to the Agent and the Lenders;

(6)     **On or before February 20, 2010**, the Debtor shall file its Section 363 sale motion (the "Sale Motion"), on an expedited basis and seeking the waiver of the 14-day stay on sale orders for "cause" and consistent with the Debtor's obligation to sell the Debtor's assets to the stalking horse buyer, subject to higher and better bids, free and clear of all liens, with the purchase price to be paid at closing in cash resulting in the full and indefeasible payment in cash of all of the indebtedness owing to the Agent and the Lenders. Each of the Sale Motion and the order thereon (the "Sale Order") shall be consistent with the terms set forth herein, and the Debtor and the Financial Advisor shall use their best efforts to prepare each of the foregoing pleadings in form and substance reasonably and substantially acceptable to the Agent and the Lenders;

(7)     **On or before March 26, 2010,** the Debtor and the Financial Advisor shall conduct an auction of the Debtor's assets, consistent with the Bid Procedures Order, resulting in the highest and best bid and the second highest and best bid to be presented to the Bankruptcy Court at the hearing on the Sale Motion consistent with the terms herein;

(8)     The hearing on the Sale Motion shall occur within three (3) days following the auction, subject to the Court's availability;

(9)     The sale of the Debtor's assets pursuant to the Sale Motion shall close **by no later than April 2, 2010**, resulting in the full and indefeasible payment in cash of the indebtedness owing to the Agent and the Lenders;

11.     Since the entry of the Fourth Cash Collateral Order, a hearing was held February 10, 2010 on the the Debtor's Motion for Approval of Bid and Sales Procedures [Docket No.208] and at the conclusion of the hearing the Court ruled that the motion would be granted and the bid and sales procedures would be approved.  As of the filing of this Sale Motion, a written order reflecting the Court's ruling has not been entered on the docket.  The Debtor anticipates that the order approving the bid and sales procedures (the "Sales Procedure Order") will be entered on or before March 1, 2010.  By the Sales Procedures Order, the Court will set the hearing on the Sale Motion for **Friday, April 2, 2010, at 9:00 a.m. Central Time**, and the deadline to object to the Sale Motion is **March 23, 2010**.  Further, the Debtor, the Agent and the Lenders, and the Official Unsecured Creditors' Committee have agreed that the Auction should commence on **March 30, 2010, at 9:00 a.m. Central Time** at the offices of the Debtor's counsel.

12.     Pursuant to the terms of Fourth Cash Collateral Order, the Debtor, in coordination with its consultants, CRG Partners Group LLC ("CRG"), contacted over fifty parties (including financial, strategic buyers and liquidators) to solicit interest in acquiring the Debtor's business in whole or in part.  The non-binding letter of intent of Stock Building Supply Holding, LLC ("Stock" or the "Stalking Horse Buyer") for an acquisition of substantially all of the Debtor's assets[1] for $15,000,000.00 represented the best preliminary stalking horse bid.

13.     Thereafter, based on such letter of intent, the Debtor, CRG, in consultation with the counsel to the Agent and CIT, and the Stalking Horse Buyer commenced intense, arms' length negotiations of a definitive agreement.  These negotiations resulted in the terms of an asset

---

[1]  Notwithstanding anything to the contrary contained herein, the Debtor's sale of its assets does not include the sale of the Excluded Assets (as defined in the Stalking Horse Agreement).

860125                                                   7

purchase agreement, subject to higher and better offers, to serve as the "Stalking Horse Agreement," entitled to bid protection pursuant to the Sales Procedures Order.

### The Proposed Sale

14.     The Debtor and the Stalking Horse Buyer entered into a certain Asset Purchase Agreement (the "Stalking Horse Agreement"), for the sale of substantially all of Debtor's assets (as summarized below) and for assumption of certain executory contracts and non-residential real property and personal property leases of the Debtor (the "Assigned Contracts and Assigned Leases"), subject to higher and better offers.  A true and correct copy of the Stalking Horse Agreement is attached as Exhibit 1 to this Sale Motion and has been filed with the Court as a part of this motion.  The Sale Motion (with the Stalking Horse Agreement attached) will be served upon (i) all parties who have previously submitted letters of intent, (ii) all parties on the current Special Service List filed with the Court, and (iii) all non-debtor parties to the non-residential real property leases and executory contracts that may be assumed and assigned under the Stalking Horse Agreement.  The Debtor shall provide a copy of the Stalking Horse Agreement to any other party upon e-mail or telephonic request made to the undersigned counsel.

15.     Pursuant to the terms of this Sale Motion, the "Purchased Assets" (as defined in the Stalking Horse Agreement) will be sold to the Stalking Horse Buyer, subject to higher and better bids, free and clear of all liens, claims, encumbrances, and interests, with the liens, claims, encumbrances, and interests to attach to the cash proceeds of the asset sale.  Based on its projections, the Debtor believes that consummation of the Stalking Horse Agreement will result in the Agent and the Lenders receiving the indefeasible payment in full in cash of the Agent Indebtedness.  Further, pursuant to the terms of this Sale Motion, the Debtor is asking the Court

to approve the cure amounts set forth in Exhibit 2 hereto with respect to the executory contracts and non-residential real property and personal property leases (collectively, the "Assigned Contracts and Assigned Leases") to be assumed and assigned by the Debtor to the Stalking Horse Buyer, subject to higher and better offers.

16.     A summary of the key terms of the Stalking Horse Agreement is set forth below:[2]

**Purchaser:** Stock Building Supply Holdings, LLC, a Virginia limited liability company, or its designee

**Debtor:** National Home Centers, Inc.

**Estimated Purchase Price:** $15,000,000 and the assumption by the Stalking Horse Buyer of the Assumed Liabilities, subject to certain adjustments based on values at Closing.

**Purchased Assets:** Assets to be purchased under the terms of the Stalking Horse Agreement include:

(a)     all Accounts Receivable;

(b)     all Inventory;

(c)     Two parcels of Real Property located at Hwy 64 East in Russelville Arkansas and a parcel and a Real Property located at Lot 21 Sycamore Park, North Little Rock, AR

(d)     the Assigned Contracts and all rights of Debtor under the Assigned Contracts;

(e)     the Assigned Leases and all rights of Debtor under the Assigned Leases;

(f)     all Personal Property;

(g)     all Intellectual Property;

(h)     all Permits of Debtor and all rights of Debtor under such Permits, to the extent such Permits are transferable by Law;

(i)     the bank accounts listed on Schedule 2.1(i);

---

[2] To the extent of any conflict between this summary and the terms of the Stalking Horse Agreement, the Stalking Horse Agreement shall control. Capitalized terms not defined herein shall have the meanings as set forth in the Stalking Horse Agreement.

(j)      except as and to the extent relating to any Excluded Assets or Excluded Liabilities, (i) all rights, claims, rebates, discounts and credits, performance and other bonds, security and other deposits, advance payments and prepayments, prepaid rents and other prepaid assets, refunds, causes of action, rights of recovery, rights of setoff and rights of recoupment in favor of Debtor, including any such rights of Debtor under any insurance Policy, any insurance proceeds or condemnation award payable to Debtor or any transferable or assignable claim therefor, (ii) all rights in and under all express or implied guarantees, warranties (including manufacturers' warranties), representations, covenants, indemnities and similar rights (including guarantees and indemnity or warranty obligations of subcontractors and professional consultants), in favor of Debtor, and (iii) all rights to any legal proceeding available to or being pursued by any Debtor, whether arising by way of counterclaim or otherwise;

(k)      all Books and Records related to the Purchased Assets; and

(l)      the Newman insurance receivable and related guaranty from Dwain Newman.

**Excluded Assets:**  **The Stalking Horse Agreement does** not include, and the bankruptcy estate of the Debtor shall retain all of its right, title and interest in and to, each and all of the following assets:

(a)      cash, cash equivalents, certificates of deposit, and other investments in marketable securities of third-party issuers;

(b)      Debtor's interest in the insurance policies of Debtor and proceeds thereof and rights thereunder related to Excluded Assets or covering Excluded Liabilities;

(c)      all right, title, and interest in and to Key Man life insurance policies and the cash surrender thereof;

(d)      all accounts and notes receivable of the Debtor for its Affiliates exclusive of the Newman insurance receivable and related guaranty from Dwain Newman;

(e)      Real Property located at 1003 Interstate Drive, Clarksville, AR 1and 304 West Main Street, Clarksville, AR and adjoining lot

(f)      all Books and Records related to Excluded Assets;

(g)      Debtor's claims rights and causes of action arising under or maintainable pursuant to sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553 of the Bankruptcy Code;

(h)     all of the Debtor's rights, claims or causes of action against third parties related to Excluded Assets;

(i)     all ERISA Plans and assets maintained pursuant to or in connection therewith;

(j)     Tax refunds related to any taxable period (or portion thereof) ending on or prior to the Closing Date;

(k)     Excluded Contracts and Leases; and

(l)     Other assets including cash surrender value of life insurance policies; any refunds or return of prepayments due under various insurance and employee benefit plans; post petition utility deposits; professional fee retainers; 1994 Toyota Supra; 2006 SunTracker Pontoon Boat; Crystal Valley Properties. Inc.

**Assumed Liabilities**:  The Stalking Horse Buyer will assume, satisfy, perform, pay, discharge and be responsible for all liabilities relating to (i) all customer obligations under the Incentive Travel Program and (ii) all Assigned Contracts and Assigned Leases arising after the Closing Date and which were not required to be performed prior to the Closing Date by Debtor (the "Assumed Liabilities"); provided that all Cure Amounts shall be paid by Debtor.

**Excluded Liabilities:**  The Purchased Assets are being sold free and clear of all Liens, Claims and Interest other than Assumed Liabilities and Permitted Liens.  Except for the Assumed Liabilities and Permitted Liens, Stock is not assuming and shall not assume, and Stockshall not in any way be responsible for, any liabilities, successor liabilities or obligations of Debtor whatsoever associated with the Purchased Assets, the Business or with any other properties, rights, contracts, or other assets of Debtor, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated, or otherwise ("Excluded Liabilities").  Without limiting the foregoing, Stock shall not be obligated to assume or to perform or discharge, and does not assume or agree to perform or discharge, any liability:  (i) arising before the Closing Date; (ii) for any obligation or expense which under the Stalking HorseAgreement shall be borne by Debtor; (iii) arising out of or related to the administration of the Debtor's Bankruptcy Case; (iv) arising out of or related to any Excluded Contract and Lease; (v) arising out of or related to any third party Claims against the Debtor, pending or threatened, including, without limitation, any warranty Claims, (vi) whether now existing or hereafter arising, under any Environmental Laws and arising out of or related to the Business (including, without limitation, any liability for administrative or civil fines or penalties for violations of Environmental Laws, or remediation or response costs for contamination); (vii) for brokerage fees of the Debtor (viii) except as otherwise specifically provided in the Stalking Horse Agreement, with respect to the Worker Adjustment and Retraining Notification Act (WARN), any and all comparable state law obligations, or any rules or regulations relating thereto; (ix) with respect to Title VII of the Civil Rights Act of 1964, the Family and Medical Leave Act, the Americans with Disabilities Act, the Civil Rights Act of 1991, the Fair Labor Standards Act,

the National Labor Relations Act, the Age Discrimination in Employment Act, COBRA or any comparable state law obligation or any rules or regulations relating thereto, (x) related to any current or former employees or executives of Debtor, whether for wages, vacation pay, payroll (including payroll Taxes), severance, retention, employment, change-of-control, pension, retirement, equity or other benefits, and whether or not arising under employment agreements, express or implied; (xi) arising out of or related to any ERISA Plan; (xii) for any Taxes related to any taxable period (or portion thereof) ending on or prior to the Closing Date; and (xiii) the Cure Amounts.

**Transferred Contracts:**  The Debtor shall assign to Stock the Assigned Contracts and Assigned Leases designated by Stock.  Stock shall have the option to add or delete contracts or leases from the Assigned Contracts and Assigned Leases, which option shall be exercisable at any time prior to the Closing.  The Debtor will be responsible for the payment of all cure and reinstatement costs or expenses of or relating to the assumption and assignment of the Assigned Contracts and Assigned Leases, except as otherwise provided for in the Stalking Horse Agreement.

**Bid Protection**:  Pursuant to the Sales Procedures Order, if the sale to the Stalking Horse Buyer does not close under specific circumstances as described therein, Stalking Horse Buyer will be entitled to a Break-Up Fee in the amount of $250,000 from the sales proceeds received at closing from the Competing Transaction.

**Contents of Sale Order:**  Debtor shall obtain the entry by the Bankruptcy Court of an order (the "Sale Order") in form and substance reasonably satisfactory to Stock and its counsel and Debtor and its counsel which shall, among other things, (a) determine that (i) this Agreement was entered into by Stock and Debtor in good faith and represents the highest or best offer for the Purchased Assets and should be approved, and (ii) Stock is a good faith purchaser under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated; (b) authorize and direct Debtor to sell the Purchased Assets to Stock pursuant to this Agreement and Section 363 of the Bankruptcy Code, free and clear of all Liens, Claims and Interest under Section 363(f) of the Bankruptcy Code), except for the Permitted Liens; (c) authorize and direct Debtor to assume and assign the Assigned Contracts and Assigned Leases under Section 365 of the Bankruptcy Code, (d) authorize and direct Debtor to execute, deliver, perform under, consummate and implement, the documents necessary to carry out the transactions contemplated hereby, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (e) provide that Stock will not assume or be liable for any liabilities of Debtor, other than the Assumed Liabilities; (f) except as specifically provided in section 6.8 herein confirm that Stock is not a "successor employer", and (g) contain such other provisions as may be necessary or reasonably desirable or appropriate to give effect to the documents necessary to carry out the transactions contemplated hereby.  Stock agrees that it will promptly take such actions as are reasonably requested by Debtor to assist in obtaining entry of a Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Stock is a "good faith" purchaser under Section 363(m) or any other section of the Bankruptcy Code and

that the Purchase Price was not controlled by an agreement in violation of Section 363(n) or any other section of the Bankruptcy Code. Any Sale Order shall provide that it shall be effective and enforceable immediately upon entry by the Bankruptcy Court notwithstanding Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

**Termination:** The Stalking Horse Agreement will be terminable pursuant to the provisions of Article IX of the Stalking Horse Agreement.

17.     This Sale Motion has been filed pursuant to the Sales Procedures Order. The Sales Procedures Order sets forth in detail the procedures for third parties to make higher and better offers, and to participate as qualified bidders in the Auction among the competing bidders. Any party desiring to make a Competing Bid and participate in the Auction should refer to the Sales Procedures Order and particularly, those procedures set forth in paragraph 8(f)-(ee) of the Sales Procedures Order.

### III.
### NOTICE OF BID DEADLINE, AUCTION DATE,
### OBJECTIONS DEADLINE AND HEARING ON THIS SALE MOTION

18.     Consistent with the Sales Procedures Order, all objections to this Sale Motion (including any objections by (i) non-debtor parties to the executory contracts and non-residential real property leases sought to be assumed and assigned hereunder, or (ii) such parties to the cure amounts set forth herein) shall be filed and served **by no later than March 23, 2010** and served upon the following parties (hereinafter, the "Notice Parties"):

> Charles T. Coleman
> Wright, Lindsey & Jennings, LLP
> 200 West Capitol Avenue, Suite 2300
> Little Rock, AR 72201
> ccoleman@wlj.com

David Weitman
K&L Gates, LLP
1717 Main Street, Suite 2800
Dallas, TX 75201
*david.weitman@klgates.com*

Michael H. Traison
Miller, Canfield, Paddock & Stone, PLC
225 W. Washington, Suite 2600
Chicago, IL 60606
*traison@millercanfield.com*

In the event that such objection is not timely filed and served as provided above, such objection shall be barred and not considered at the time of the hearing on this Sale Motion.

19.    The Bid Deadline for submitting Qualified Competing Offers (as defined in the Sales Procedures Order) is **March 26, 2010 at 5:00 p.m. Central Time.**  Qualified Competing Offers must be submitted as set forth in the Sales Procedures Order.

20.    The Auction, if any, as described in the Sales Procedures Order shall commence on **March 30, 2010 at 9:00 a.m. Central Time** at the offices of Wright, Lindsey & Jennings LLP, 903 North 47th Street, Suite 101, Rogers, Arkansas or at another date, time or place to be determined by the Debtor and noticed to the Qualified Bidders and the Notice Parties, consistent with the Sales Procedures Order.

21.    Pursuant to the Sales Procedures Order, the hearing on this Sale Motion will be held on **April 2, 2010, at 9:00 a.m. Central Time** at 35 East Mountain Street, Fourth Floor, Room 416, Fayetteville, Arkansas 72702.

## RELIEF REQUESTED

22.    By this Sale Motion, the Debtor requests that the Court approve the proposed sale of the Debtor's assets pursuant to the terms of the Stalking Horse Agreement to the Stalking Horse

860125                                                  14

Buyer, subject to higher and better offers, received at the Auction conducted pursuant to the Sales Procedures Order, upon the terms set forth in the Stalking Horse Agreement (or such agreement of the Successful Bidder, substantially in the form of the Stalking Horse Agreement), free and clear of all liens, claims, encumbrances, and interests (other than certain Assumed Liabilities and Permitted Liens) and that the executory contracts and non-residential real property leases set forth in the Stalking Horse Agreement be assumed and assigned to the Stalking Horse Buyer or the Successful Bidder, with cure amounts to the non-debtor parties to such contracts as set forth on Exhibit 2 hereto. Hereafter, the term "Sale" shall mean such sale of the Debtor's assets and the assumption and assignment of the Assigned Contracts and Assigned Lease identified in the Stalking Horse Agreement (or the agreement of the Successful Bidder).

## A.     The Sale Should be Approved

23.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *Cajun Elec. Power Coop., Inc. v. Official Comm. of Unsecured Creditors (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997). A debtor must demonstrate sound business judgment for a sale of assets outside of the ordinary course of business. *See, e.g., Institutional Creditors of Continental Airlines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3rd Cir. 1996), citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbots Dairies of Pennsylvania, Inc.,* 788 F2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club,* 128 B.R. 396 (W.D.

Pa. 1991). *As stated in Unsecured Creditors' Committee v. Jones Truck Lines, Inc.*, 156 B.R.

608, 615 (W.D. Ark. 1992):

> More importantly, a plan is not necessary to a Chapter 11 liquidation scheme,
> though it may be preferable. *See In the matter of Engineering Products Co.*, 121
> B.R. 246, 247, 249 (Bankr.E.D.Wisc.1990). In that case, the court ruled that in
> order to forego the need for a plan the bankruptcy court must (1) require an
> articulated business justification for sale of the assets; (2) find that the purchaser
> acted in good faith in the course of the sale, *i.e.*, no fraud, collusion or any attempt
> to take unfair advantage of other bidders; and (3) find that the purchase price is fair
> and reasonable, that the sale is in the best interests of the estate, and that the assets
> will substantially diminish in value if not immediately sold. *Id.* at 247-48.

24.    As a result of the extensive marketing efforts conducted by the Debtor, with the

assistance of its financial advisor, CRG, as approved by the Sales Procedures Order, the Debtor

believes that the offer for the assets received from the Stalking Horse Buyer (or the Successful

Bidder) will be fair and reasonable, and will provide maximum value for the Sale of the Debtor's

assets.

25.    The Debtor has proposed the Sale after thorough consideration of all viable

alternatives, and has concluded that after following the procedures set forth the Sales Procedures

Order the Sale of the Debtor's assets will be supported by a number of sound business reasons and

is in the best interest of the Debtor, its estate, and its creditors. As further assurance of such value,

the Sale will be tested through an Auction consistent with the requirements of the Bankruptcy

Code, Bankruptcy Rules, and pursuant to the Sales Procedures Order.

26.    Upon the conclusion of the Auction, the Debtor, the Court, and all creditors and

parties in interest can be assured that the purchase price for the Sale of the Debtor's assets will be

at fair market value. Consequently, the fairness and reasonableness of the consideration to be

paid by purchaser ultimately will be demonstrated by adequate "market exposure" and an open

and fair auction process – the best means for establishing whether a fair and reasonable price is being paid.

**B.    The Sale of the Debtor's Assets Does Not Constitute a Sub Rosa Plan of Reorganization**

27.    The proposed Sale of Debtor's assets does not constitute a sub rosa plan of reorganization as contemplated by *Pension Benefit Guar. Corp. v. Braniff Airways,* Inc. *(In re Braniff Airways, Inc.)*, 700 F.2d 935, 939-940 (5th Cir. 1983). This Sale Motion simply proposes to sell all of the Debtor's assets *without* altering the rights of the Debtor's creditors. The sale of the Debtor's assets does not specify the terms under which a plan of reorganization is to be adopted and does not bind any parties or creditor constituencies under any future plan of reorganization that may be proposed by the Debtor or any other party. *See In re Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. D. Md. 1988) (stating, "the sale proposed here is not a sub rosa plan because it seeks only to liquidate assets, and the sale will not restructure rights of creditors, as in the Braniff case."); *see also E. Airlines, Inc. v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 654 n.6 (S.D.N.Y. 1995) (distinguishing *Braniff*).

28.    Further, case law from other circuits has clearly established that a sale of *substantially* all of the assets of a debtor prior to confirmation, or even prior to filing, of a plan of reorganization, is permissible. *See In re Ionosphere*, 184 B.R. at 653 ("[C]ourts consistently have acknowledged that assets of an estate can be sold prior to the confirmation, or even filing of a plan."); *see also In re Chateaugay Corp.*, 973 F. 2d. 141 (2d Cir. 1992) (proceeds of a sale placed in escrow pending distribution through a plan). Here, after the Sale of the Debtor's assets, to the extent authorized by this Court pursuant to the Sale Order, the proceeds from the sale shall remain with the Debtor subject to all liens, claims, encumbrances, and other interests attaching to such

sales proceeds in accordance with their priorities under the Bankruptcy Code and consistent with the Stalking Horse Agreement and prior orders of this Court.  Accordingly, the Debtor submits that the sale of the Debtor's assets does not constitute a *sub rosa* plan of reorganization.

29.     Courts have routinely approved the debtor's sale of substantially all of its assets outside of a plan of reorganization, where there is a risk that the assets may decline in value prior to the confirmation of the plan.  *See e.g. Unsecured Creditors' Committee v. Jones Truck Lines, Inc.*, *supra.*  In the instant case, the Agent and the Lenders, who have agreed with the Debtors for the expedited sale of the assets, outside of a plan of reorganization, and which agreement is reflected in the Fourth Cash Collateral Order, believe there is such risk.  Moreover, the Stalking Horse agreement does not dictate the terms of a plan of reorganization, as it does not attempt to dictate or restructure the rights of the creditors of this estate. It merely brings in value. Creditors will thereafter share in that value pursuant to a chapter 11 plan subject to confirmation by the Court. A transaction contemplating that does not amount to a *sub rosa* plan. *In re General Motors Corp.,* 407 B.R. 463, 495 -496 (Bkrtcy.S.D.N.Y., 2009); *In re Trans World Airlines, Inc.,* 2001 WL 1820326, at 11 (Bankr.D.Del. Apr.2, 2001).

## B.     The Sale Should be Free and Clear of All Liens, Claims, Encumbrances, and Interests

30.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

a.     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

b.     such entity consents;

c.     such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

    d.      such interest is in bona fide dispute; or

    e.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Collins*, 180 B.R. 447, 449-50 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the court to approve the proposed sale."); *In re P.K.R. Convalescent Ctrs., Inc.*, 189 B.R. 90, 93-94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens ....Section 363(f) addresses sales free and clear of any interest...."); *In re General Bearing Corp.*, 136 B.R. 361, 366 (Bankr. S.D.N.Y. 1992) (listing requirements).

    31.    Other than the liens in favor of (i) the Agent and the Lenders under the Credit Agreement, (ii) Liberty to secure the Liberty Notes, and (iii) CIT and BOA to secure the Capital Leases, the Debtor is unaware of any (i) liens, encumbrances or interests or (ii) "claims" as defined in section 101(5) of the Bankruptcy Code against the Purchased Assets. The Agent and the Lenders have been kept informed throughout the negotiation of the APA and Sales Procedures. The Debtor expects that the secured lenders will consent to the Sale and thus subsection (2) will be satisfied as to such parties. Furthermore, the Debtor proposes that all liens, interests, encumbrances, and claims attach to the net cash proceeds derived from the Sale in the same validity, force and effect that such liens, interests or claims now have against the Purchased Assets, subject to the rights and defenses, if any, of the Debtor with respect thereto, consistent with the Stalking Horse Agreement and prior orders of this Court. The Debtor believes that the holder of any lien, claim, encumbrance, or interest will be adequately protected thereby and that section 363(f) will be satisfied. The Debtor accordingly requests that it be authorized to convey the

Purchased Assets to Stock or the Successful Bidder at the Auction free and clear of all liens, encumbrances, claims, or interests (except for Assumed Liabilities and Permitted Liens), with such liens, encumbrances, claims and interests to attach to the proceeds of the Sale.

### C.     The Sale of Assets Should Be Free of Any Successor Liability

32.     Under the terms of the proposed Sale, Stalking Horse Buyer (or the Successful Bidder) will not be liable for any of the Debtor's liabilities as a successor to the Debtor's business or otherwise (the "Excluded Liabilities"), unless expressly assumed. Extensive case law exists providing that claims cannot be asserted against the winning bidder, but rather are directed to the proceeds of a sale of property conducted pursuant to §363 of the Bankruptcy Code.

33.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interests," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregory, JV*, 209 F3d 252, 259 (3d Cir. 2000). In the case of *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." 322 F.3d at 288-89. The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property." Id. at 289 (citing *3 Collier on Bankruptcy3 Collier on Bankruptcy* 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger, supra*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger* stated that *Leckie* held

860125                                                20

that the debtors "could sell their assets under §363(f) free and clear of successor liability that

otherwise would have arisen under federal statute." *Folger*, 209 F.3d, at 258.

34.     Courts have consistently held that a purchaser of a debtor's assets pursuant to a §

363 sale takes free from successor liability resulting from pre-existing claims. *See, Ninth Avenue*

*Remedial Group*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has

the power to sell assets free and clear of any interest that could be brought against the bankruptcy

estate during the bankruptcy); *In re Johns-Manville Corp.*, 837 F.2d 89 (2d Cir.), cert denied,

488 U.S. 868 (1988) (channeling of claims to proceeds consistent with intent of sale free and clear

under section 363(f) of the Bankruptcy Code; *In re New England Fish Co.*, 19 B.R. 323 (Bankr.

W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII

employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R.

874 (Bankr. D.R.I. 1985), *aff'd*, 65 B.R. 985 (D.R.I. 1986) (transfer of liquor license free and

clear of any interest permissible even though the estate had unpaid taxes); *In re All Am. of Ashburn,*

*Inc.,* 56 B.R. 186 (Bankr. N.D. Ga.), *appeal decided by*, 805 F.2d 1515 (11th Cir. 1986) (product

liability claims precluded on successor doctrine in a sale of assets free and clear); *In re WBQ*

*Partnership*, 189 B.R. 97 (Bankr. E.D. Va. 1995) (State of Virginia's right to recapture

depreciation is an interest as used in section 363(f)).

35.     In this matter, the Stalking Horse Buyer (or the Successful Bidder) and the Debtor

will be completely and wholly unrelated entities. For obvious reasons, the very purpose of an

order authorizing the transfer of assets free and clear of all "interests" would be frustrated if

claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising

from the Debtor's pre-sale conduct. Under § 363(f) of the Bankruptcy Code, the Stalking Horse

Buyer (or the Successful Bidder) is entitled to know that the Debtor's assets are not infected with latent claims that will be asserted against the Stalking Horse Buyer (or the Successful Bidder) after the proposed transaction is completed. Accordingly, the order approving the Sale of the Debtor's assets should state that the Stalking Horse Buyer (or the Successful Bidder) is not liable as a successor under any theory of successor liability, for claims that encumber or relate to, or purported to encumber or relate to, the Debtor's assets.

> **D.  The Sale Should be Subject to the Protections of Bankruptcy Code Section 363(m) in the Event of Reversal or Modification on Appeal.**

36.  Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbots Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

37.  The Stalking Horse Agreement is an intensely-negotiated, arm's-length transaction, in which the Stalking Horse Buyer has, at all times, acted in good faith under the *Abbotts Dairy* standards. The proposed Sale also is the product of arms-length, good faith negotiations, in which

the Debtor bargained for the maximum possible purchase price for the Debtor's assets. The negotiations involved substantial time and energy by the parties and their professionals, and the Stalking Horse Agreement reflects give and take and compromises by both sides and was negotiated subject to the protections afforded by the Sales Procedures Order.

38.     Under the circumstances, the Debtor submits that the proposed Sale is the result of good faith, arm's-length negotiations and that the Stalking Horse Buyer is entitled to all of the protection of Section 363(m) of the Bankruptcy Code. Likewise, in the event the Assets are sold to another Successful Bidder upon Auction as provided by the Sales Procedure Order, the integrity of the Sale will be maintained pursuant to the protections afforded by the Sales Procedure Order, and the Successful Bidder will be entitled to the protections of § 363(m).

### E.     The Debtor Should be Authorized to Assume and Assign Certain Designated Executory Contracts and Non-Residential Real Property Leases to Stalking Horse Buyer or the Successful Bidder.

39.     As required by the Stalking Horse Agreement (or the agreement of the Successful Bidder), and in order to enhance the value of the Debtor's assets by curtailing further administrative liability to the estate and to eliminate substantial rejection claims, the Debtor requests the Court's authorization and approval, under 11 U.S.C. § 365, to assume and assign certain executory contracts and unexpired leases of non-residential real property and personal property identified in Exhibit 2 (the Assigned Contracts and Assigned Leases) and to cure pre-petition defaults, if any, in the amounts set forth on Exhibit 2 (the "Cure Amounts") attached hereto.

40.     The Debtor further requests that the Sale Order approving such sale provide that the Assigned Contracts and Assigned Leases will be transferred to, and remain in full force and

effect for the benefit of Stalking Horse Buyer (or the Successful Bidder), notwithstanding any provisions in the Assigned Contracts and Assigned Leases that prohibit such assignment.

41.    The Debtor and the Stalking Horse Buyer are continuing their review of the Debtor's executory contracts and non-residential real property and personal property leases in order to determine whether all of the Assigned Contracts and Assigned Leases should be assumed and assigned. Further, the Sales Procedures Order calls for an Auction of the Debtor's assets and there is no guaranty that the Stalking Horse Buyer will be the purchaser of the Debtor's assets at the closing of the Sale. A purchaser other than the Stalking Horse Buyer may desire for Debtor to assume and assign Debtor's executory contracts and non-residential real property and personal property leases different from those requested by the Stalking Horse Buyer. The Debtor must consider the cure costs associated with any contract sought to be assumed and assigned by the purchaser.

42.    The Debtor therefore reserves the right to withdraw or to add the Debtor's executory contracts and non-residential real property and personal property leases from the request, up to and including the closing date and further requests that the effective date of the assumption and assignment of the Assigned Contracts and Assigned Leases be deferred to the closing of the Sale. Any default in Assigned Contracts and Assigned Leases that the Stalking Horse Buyer (or the Successful Bidder) determines to assume shall be cured, if any cure is necessary, at closing at which time the assumption and assignment shall become effective and binding on all parties. To the extent that the Stalking Horse Buyer or the Successful Bidder determines not to assume any one or more of the Assigned Contracts or Assigned Leases prior to closing, the Debtor shall give notice to the non-debtor parties to such contracts and leases and to

counsel to the Debtor of such determination and such contracts and leases shall not be assumed by the Debtor and assigned to the Stalking Horse Buyer (or the Successful Bidder). Any contract or lease not assumed by virtue of such notice shall be subject to rejection pursuant to Section 365 of the Bankruptcy Code relating to rejected contracts.

43.    Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

[t]he trustee may assign an executory contract or unexpired lease of the debtor only if –

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

44.    Under § 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A)  cures, or provides adequate assurance that the trustee will promptly cure, such default . . .;

(B)  compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)  provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

45.     Although § 365 does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such decision. As set forth herein there exists sound business justification for the assumption and assignment of the Assigned Contracts and Assigned Leases.

46.     The Debtor has determined that the assumption and assignment of the Assigned Contracts and Assigned Leases represents an exercise of sound business judgment. Moreover, the Debtor is able to satisfy the requirements of Section 365(b) and (f) of the Bankruptcy Code with respect to the assumption and assignment of the Assigned Contracts and Assigned Leases, pursuant to the Stalking Horse Agreement, all amounts required to cure pre-petition and post-petition defaults under the Assigned Contracts and Assigned Leases will be paid by the Debtor under the Stalking Horse Agreement (with such Cure Amounts as set forth on Exhibit 2 hereto), and the Stalking Horse Buyer (or the Successful Bidder) will be prepared to demonstrate at the hearing on the Sale Motion that the requirement of adequate assurance of future performance by the Stalking Horse Buyer (or the Successful Bidder) will be satisfied. Therefore, the assumption of the Assigned Contracts and Assigned Leases will place no financial burden on the Debtor's estate, other than such Cure Amounts. In addition, assumption and assignment of the Assigned Contracts and Assigned Leases will maximize the value of the Debtor's assets to be sold under the Sales Procedures Order. For these reasons, assumption and assignment of the Assigned

Contracts and Assigned Leases is in the best interest of the Debtor's estate and should be approved.[3]

47.     Any objection to the assumption and assignment of any of the Assigned Contracts and Assigned Leases or the Cure Amounts must be filed no later than end of business on **March 23, 2009.** If no objection is timely received, the Cure Amounts set forth in the Exhibit 2 shall be controlling notwithstanding anything to the contrary in the Assigned Contracts and Assigned Leases or any related documents, and each non-Debtor party to the Assigned Contracts and Assigned Leases shall be forever barred from asserting a different Cure Amount or any other claim arising prior to the assignment against the Debtor, the Stalking Horse Buyer, or the Successful Bidder as to any of the Assigned Contracts and Assigned Leases. If an objection to any assumption and assignment of any of the Assigned Contracts and Assigned Leases is made, a hearing on such objection shall be held at the Sale Hearing. If an objection by the non-Debtor contracting party is made only with respect to the Cure Amount in respect of any of the Assigned Contracts and Assigned Leases, the parties shall agree, in advance of the hearing on this Sale Motion, upon a reasonable amount to be escrowed by the Debtor, pending a subsequent hearing by the Court after the Sale Hearing to determine the allowed amount of the Cure Amount.

**F.      The Court Should Determine that Proper Notice of the Sale has Been Given and No Other Notice is Required.**

---

[3] At any time up to the closing of the Stalking Horse Agreement (or the agreement of the Successful Bidder), the Debtor may add or remove contracts from the list of those contracts and leases that are to be Assigned Contracts and Assigned Leases, based upon the terms of the Stalking Horse Agreement (or the agreement of the Successful Bidder), determined by the Debtor, subject to the Sales Procedures Order, to be the highest and best offer for the Debtor's assets and based upon the Debtor's further and continuing due diligence into the Debtor's assets. In the event that the Debtor adds or removes contracts or leases from the list of the Assigned Contracts and Assigned Leases, the Debtor will immediately provide notice of same to any affected non-debtor party to such contracts or leases.

48.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private or by public auction. *See* Fed. R. Bankr. P. 6004(f)(1). Bankruptcy Rule 2002(a)(2) requires notice of at least 21 days of a proposed use, sale or lease of property of the estate other than in the ordinary course of business. Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. *See* Fed. R. Bankr. P. 2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property. *Id.* Service of this Sale Motion provides notice of the Sale in accordance with these rules as set forth below.

49.    On or before March 1, 2010, the Debtor shall serve (i) copies of this Sale Motion without exhibits to all creditors and parties in interest, and (ii) copies of this Sale Motion with the Stalking Horse Agreement attached as Exhibit 1 hereto and the proposed Cure Amounts attached as Exhibit 2 hereto upon (a) all parties identified on Debtor's current special service list filed in this case; (b) all parties who have expressed in writing an interest to acquire the Debtor's assets, (c) to the United States Trustee; and (d) non-debtor parties to all leases and executory contracts sought to be assumed and assigned in connection with the Sale of the Debtor's assets (including the Assigned Contracts and Assigned Leases). The Debtor submits that notice of this Sale Motion as set forth herein is in compliance with Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006. As set forth above, creditors and other interested parties have been provided notice of the

salient details regarding this Sale Motion and the hearing on this Sale Motion. Accordingly, notice is sufficient under § 363 of the Bankruptcy Code.[4]

50.     Moreover, Rule 6006 of the Federal Rules of Bankruptcy Procedure requires notice of a motion to assume or assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as the Court may direct. This Sale Motion, requesting authorization to assume and assign the Assigned Contracts and Assigned Leases identified on <u>Exhibit 2</u> (including the proposed Cure Amounts with respect thereto), has been served on non-debtor parties to the Assigned Contracts and the Assigned Leases by first class mail, by mailing a copy of this Sale Motion to the attention of an officer, managing agent or other person authorized by appointment or by law to receive service of process, and thus satisfies this requirement.

51.     Notice of this Sale Motion in the manner described above is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Sale Motion.

### G.     The Court Should Waive or Reduce the Fourteen-Day Stay Period of Bankruptcy Rules 6004(g) and 6006(d).

52.     Pursuant to Bankruptcy Rules 6004(g) and 6006(d), unless the court orders otherwise, (i) all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code and (ii) all orders authorizing the assignment of executory contracts or unexpired leases

---

[4] This Sale Motion contains the information required to be served by Paragraph 8(e) of the Sales Procedure Order and therefore also serves as the Notice of Hearing Date to be served pursuant to Paragraph 8(e) of the Sales Procedures Order.

under section 365 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order. The purpose of Bankruptcy Rules 6004(g) and 6006(d) is to provide sufficient time for an objecting party to appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(g) and 6006(d).

53.     Although Bankruptcy Rules are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedures." 10 Collier on Bankruptcy, ¶ 6064.09 (L. King, 15th rev. ed. 2004). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

54.     The Debtor requests that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(g) and 6006(d).

**WHEREFORE,** based upon the foregoing, the Debtor respectfully requests that this Court grant this Sale Motion, thereby approving the (i) sale of substantially all of the Debtor's assets to the Stalking Horse Buyer, subject to higher and better offers, free and clear of all liens, claims, encumbrances, and other interests, (ii) assumption and assignment of the Assigned Contracts and Assigned Leases, and (iii) cure amounts and procedures with respect to same set forth herein, and granting such other and further relief that is necessary and proper.

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
Telephone: 501-371-0808
Fax:        501-376-9442
Email: ccoleman@wlj.com
       jhenry@wlj.com
       ktucker@wlj.com

By:     _____
        Charles T. Coleman (80030)
        Judy Simmons Henry (84069)
        Kimberly Wood Tucker (83175)
        Attorneys for National Home Centers, Inc.


## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing was sent via CM/ECF transmission to those parties requesting notice by CM/ECF transmission as reflected on Special Service List Dated February 23, 2010 [Docket No. 387] this 26 day of February, 2010.

Further service of the foregoing shall be made as set forth herein and a Certificate of Mailing shall be filed reflecting such service.

_____
Charles T. Coleman

860125                              31