IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE:  NATIONAL HOME CENTERS, INC.,          CASE NO. 5:09-bk-76195
        Debtor                                                             CHAPTER 11

## DISCLOSURE STATEMENT TO ACCOMPANY
## CHAPTER 11 PLAN OF LIQUIDATION

National Home Centers, Inc. the "Debtor" or "NHC") submits this Disclosure Statement for use in soliciting acceptances of its Chapter 11 Plan of Liquidation dated October 22, 2010.

****NOTICE****

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION SUPPLEMENTARY TO THE PLAN AND IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN. CREDITORS ARE ADVISED TO STUDY THE PLAN CAREFULLY TO DETERMINE THE PLAN'S IMPACT ON THEIR CLAIMS OR INTERESTS. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE DEBTOR AND ITS PROFESSIONAL PERSONS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACIES, ALTHOUGH THEY HAVE MADE GREAT EFFORT TO PRESENT ACCURATE INFORMATION. IN PARTICULAR, THE PROJECTIONS ON EXHIBIT C AND THE ESTIMATES OF ANTICIPATED CLAIM AMOUNTS, ASSET RECOVERIES AND EXPENSES CANNOT BE GUARANTEED AND ACTUAL RESULTS

MAY DIFFER MATERIALLY FROM THE ESTIMATES AND PROJECTED AMOUNTS SET FORTH HEREIN.

NOTHING CONTAINED IN THE PLAN SHALL BE DEEMED AN ADMISSION THAT CAN BE USED AGAINST THE DEBTOR OR DISSOLUTION AGENT IN ANY PENDING OR FUTURE LITIGATION.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY INFORMATION AUTHORIZED BY THE DEBTOR TO BE DISTRIBUTED TO CREDITORS.  CREDITORS SHOULD NOT RELY ON REPRESENTATIONS OTHER THAN THOSE SET FORTH IN THE DISCLOSURE STATEMENT OR THE PLAN IN CONSIDERING WHETHER TO ACCEPT THE PLAN.

## I.    INTRODUCTION

### A.    Background

On December 8, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to wind down its business and manage its properties as debtor-in-possession. No trustee or examiner has been appointed in the Debtor's case. A committee of unsecured creditors (the "Unsecured Creditors Committee") has been appointed.

With the approval of the Court, the Debtor employed the law firm of Wright, Lindsey & Jennings LLP ("Debtor's Counsel") as its attorneys to represent it as debtor-in-possession on the terms stated in the employment application and the Order of the Court approving such employment.

Simultaneously with the filing of this Disclosure Statement, the Debtor is filing a Chapter 11 Plan of Liquidation (the "Plan"), which will be discussed and described in this Disclosure Statement. Terms defined in the Plan and not otherwise specifically defined in this Disclosure Statement will have the same meanings set forth in the Plan when used in this Disclosure Statement. A copy of the Plan is attached hereto as Exhibit A.

The Plan proposes the liquidation of all assets that have not already been liquidated in the course of this Chapter 11 Case and for the distribution of the Debtor's net cash in accordance with the requirements of the Bankruptcy Code.

### B.  Purpose

The purpose of a Disclosure Statement is to provide the Holders of Claims against, and Interests in, Debtor with adequate information about Debtor and its assets and debts sufficient to enable such Holders to make an informed judgment about the merits of approving the Plan.

After notice to all creditors and parties in interest, the Court by Final Order dated _____ approved this Disclosure Statement as containing "adequate information" (as defined in § 1125(a) of the Code) of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the Holders of Claims against, and Interests in, Debtor to make an informed judgment in voting to accept or reject the Plan. Approval of this Disclosure Statement by the Court does not constitute a recommendation to accept or reject the Plan.

### C.  Brief Explanation of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Code. Pursuant to Chapter 11, a debtor may be reorganized or liquidated for its benefit and that of the holders of claims against and interests in the debtor. Attempts to collect upon pre-petition claims from the debtor or attempts to foreclose upon the debtor's assets by any secured creditor are stayed

during the pendency of the case. In this Chapter 11 Case, the Debtor continued in possession of its property and operated its businesses as a debtor-in-possession pursuant to the provisions of § 1107 and § 1108 of the Code. The Plan is the sole vehicle for satisfying the rights of Holders of Claims against and Interests in the Debtor.

### D.    Disclaimers

THE DEBTOR PROVIDES THIS DISCLOSURE STATEMENT TO ALL KNOWN HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR TO DISCLOSE INFORMATION ADEQUATE TO ALLOW SUCH HOLDERS OF CLAIMS AND INTERESTS TO ARRIVE AT AN INFORMED JUDGMENT IN EXERCISING THEIR RIGHT TO VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN OF LIQUIDATION.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR, THE DISSOLUTION AGENT OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE LEGAL EFFECTS OF THE LIQUIDATION OF THE DEBTOR UPON THE HOLDERS OF CLAIMS OR INTERESTS.

NO REPRESENTATIONS BY ANY PERSON CONCERNING THE DEBTOR (PARTICULARLY AS TO ITS BUSINESS OPERATIONS, OR THE VALUE OF ITS PROPERTY) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR VOTE ON THE PLAN OTHER THAN CONTAINED IN THIS

DISCLOSURE STATEMENT SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION. SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO DEBTOR'S COUNSEL, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS THE COURT DEEMS APPROPRIATE.

THE DEBTOR'S FINANCIAL AFFAIRS AND THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT ARE SOMEWHAT COMPLEX. YOU ARE URGED TO CONSULT WITH YOUR FINANCIAL ADVISOR, YOUR TAX ADVISOR, YOUR ATTORNEY AND WITH OTHER HOLDERS OF CLAIMS OR INTERESTS TO FULLY UNDERSTAND THE DISCLOSURE STATEMENT AND THE PLAN.

THE PROJECTIONS ON EXHIBIT C AND THE ESTIMATES OF ANTICIPATED CLAIM AMOUNTS, ASSET RECOVERIES AND EXPENSES CANNOT BE GUARANTEED AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE ESTIMATES AND PROJECTED AMOUNTS SET FORTH HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT WAS COMPILED.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR AND ITS COUNSEL DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH ALL SUCH INFORMATION IS ACCURATE TO THEIR BEST KNOWLEDGE, INFORMATION AND BELIEF.

## II.    CONFIRMATION PROCEDURES AND EFFECT

The Plan cannot be consummated unless it is confirmed by the Court. Confirmation of the Plan requires that, among other things, either (i) each Class of Claims or Interests that is impaired by the Plan has voted to accept the Plan by the requisite majority, or (ii) the Plan is determined by the Court to be fair and equitable, as defined by the Code, with respect to Classes of Claims or Interests that have rejected the Plan. The Code also requires that the confirmation of the Plan be in the "best interests" of all Holders of Claims and Interests.

The Debtor believes that the Plan meets the classification requirements of the Code, which require that all Claims or Interests in a Class be "substantially similar." Disputes regarding the proper classification of Claims or Interests not specifically classified in the Plan shall be resolved pursuant to the procedures established by the Code, the Rules and other applicable law.

### A.  Creditors Eligible to Vote

Only the votes of Classes whose Claims or Interests are impaired by the Plan will be counted in connection with the confirmation of the Plan. Generally, and subject to the specific provisions of § 1124 of the Code, a Class is "impaired" if its legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified, other than by curing

894419-v1                                               6

defaults in stated maturities or by payment in full, in Cash, on the Effective Date. All classes are impaired under the Plan and, accordingly, entitled to vote to accept or reject the Plan. Though impaired, Class 6 receives no distribution under the Plan, and, therefore, is deemed to have rejected the Plan. Any class receiving no distribution under the Plan is deemed to have rejected the Plan pursuant to 11 U.S.C. § 1126(g). In determining acceptance of the Plan, votes will be counted only if submitted by a Holder of an Allowed Claim. Claims may be allowed by the Court for voting purposes only.

### B. Acceptances Necessary to Confirm the Plan

For the Plan to be accepted and thereafter confirmed, it must be accepted by at least one Class of Claims that is impaired by the Plan. Under § 1126 of the Code, an impaired Class is deemed to have accepted the Plan if: (i) with respect to a Class of Claims, votes representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims that have voted in that Class have accepted the Plan; and (ii) with respect to a Class of Interests, votes representing at least two-thirds (2/3) in amount of those Allowed Interests that have voted have accepted the Plan; provided that the vote of any Holder of an Allowed Claim or Allowed Interest whose acceptance or rejection of the Plan was not made in good faith, as determined by the Court, will not be counted.

Unless every Class of Claims that is impaired unanimously accepts the Plan, the Court, in order to confirm the Plan, must independently determine that the Plan provides to each Holder of a Claim of such Class a recovery which has a value, as of the Effective Date, at least equal to the value, as of the Effective Date, of the distribution which such Holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Code on the Effective

7

Date. The Debtor believes that the Disclosure Statement and Plan will enable the Court to make this determination.

### C. Manner of Voting

A ballot will be sent to you with this approved disclosure statement for use in voting for or against the Plan. Please use only the ballots sent to you or a photocopy of the ballots. If you have an Allowed Claim in more than one (1) Class, you may vote multiple ballots. The ballots provided will include instructions on how to complete the ballot and to where the completed ballot should be mailed.

### D. Confirmation Without Acceptance

Section 1129(b) of the Code provides that the Plan may be confirmed by the Court despite not being accepted by every impaired Class if: (i) at least one impaired Class of Claims has accepted the Plan; and (ii) the Court finds that the Plan does not discriminate unfairly and is fair and equitable to the rejecting Classes. Among other things, such a finding would require a determination by the Court that the Plan provides that no Holder of an Allowed Claim or Allowed Interest junior to the rejecting Class will receive or retain any property or payment under the Plan, until or unless such rejecting Class is paid in full.

The Debtor reserves the right pursuant to § 1129(b) of the Code to request the Court to confirm the Plan if all of the applicable requirements of § 1129(a) of the Code have been met. In addition, the Debtor reserves the right pursuant to § 1126(e) of the Code to request the court to strike any ballot rejecting the Plan cast by any Holder of a Claim or Interest which was not cast in good faith.

### E. Discharge Upon Confirmation

The Confirmation Order shall provide for the discharge of the Debtor from all Claims to the extent allowed pursuant to § 1141 of the Code and shall constitute an injunction against the pursuit of any Claim or Interest or Administrative Expense except as otherwise provided in the Plan. Parties asserting entitlement to payment of Administrative Expenses incurred Prior to the Confirmation Date and Holders of Claims and Interests shall be permanently enjoined from asserting any Claim or Interest against the Debtor, the Dissolution Agent, the Debtor's Assets based upon any act or omission, transaction or other activity that occurred prior to the Confirmation Date, except as otherwise provided in the Plan, whether or not a proof of claim or interest was filed and whether or not such claim or interest is allowed under § 502 of the Bankruptcy Code. The rights afforded under the Plan and the treatment of Administrative Expenses, Claims including without limitation §503(b)(9) Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and termination of all Interests, unless otherwise set forth in the Plan.

### F. Binding Effect of Plan

The provisions of the Plan shall be binding upon and inure to the benefit of all persons, entities, and governmental authorities described herein and/or claiming an interest in any and all property in which Debtor has an interest and such persons', entities', and governmental authorities' successors, heirs and assigns whether or not such persons, entities, and governmental authorities vote to accept the Plan. Failure to file a timely objection to the Plan will be deemed to be an agreement to the terms of the Plan for purposes of § 1129(a)(9).

## III. GENERAL INFORMATION ABOUT DEBTOR AND THIS CASE

The information set forth in this Section is true and correct to the best of the Debtor's knowledge, information and belief.

### A. History of Debtor

National Home Centers, Inc. is an Arkansas Corporation, with its corporate offices and principal place of business in Springdale, Arkansas.

The Debtor was founded in 1972 as a distributor and retailer of homebuilding materials to construction contractors, homebuilders and do-it-yourself consumers primarily in Arkansas, Oklahoma, Kansas and Missouri. The Debtor's product lines included appliances, home décor, dimensional lumber, hardware, doors, a wide variety of other construction and homebuilding materials, and furniture.

The Debtor's sales were conducted through building contractors and, although Debtor maintained a solid reputation among its customer base, the nationwide decline in homebuilding activity adversely affected Debtor's operations. The U.S. Department of Housing and Urban Development estimated that privately-owned building permits indicating future construction projects declined 47% from May, 2008 to May, 2009 and privately owned housing starts in May, 2009 were 45.2% below the May, 2008 levels. These market conditions substantially impacted NHC's sales. During the same period, credit markets providing NHC and related industry borrowers, including many of the Debtor's customers, with necessary revolving operating lines of credit significantly tightened, and the Debtor's working capital was significantly constricted.

At the time this case was filed, the Debtor operated retail home centers in Springdale, Russellville, Little Rock, Bentonville, North Little Rock, Conway, Fort Smith and Clarksville, Arkansas and retail flooring centers in Springdale and Conway, Arkansas. A retail home center in Heber Springs, Arkansas was closed in June of 2009. After this case was filed Debtor closed its stores in Bentonville, Little Rock and Clarksville.

On August 12, 2004, the Debtor entered into a secured credit agreement (the "Credit Agreement") with JPMorgan Chase Bank as Administrative Agent on behalf of itself and other lenders ("JP Morgan"). The Credit Agreement was amended from time to time through the Eighth Amendment dated November 30, 2009. The Credit Agreement, together with amendments, provided the Debtor with a revolving credit facility (the "Credit Facility"). To secure the repayment of the obligations of the Debtor under the Credit Agreement and other related loan documents, the Debtor granted to the Agent and the Lenders first-priority security interests in and liens on substantially all of the assets of the Debtor (with the exception of various motor vehicles and equipment), and including without limitation, inventory, receivables, certain real property, cash and proceeds of the foregoing.

In the months prior to the petition date, pursuant to the terms amendments to the Credit Facility, the availability of credit to Debtor was materially reduced. Immediately prior to the filing of the petition, the lenders notified the Debtor that the lenders would not continue providing credit under the credit facility without further material reductions in the credit availability. The lenders unwillingness to provide sufficient credit availability resulted in the Debtor having insufficient funds to continue routine operations, absent a chapter 11 filing. Also, the Debtor had a number of real property leases for its stores, which could be more effectively dealt with through a chapter 11 proceeding. At the time of the filing of this Case,

the Debtor's goal was to reorganize its operations to profitably serve its customer base. As of the Petition Date, the amount owed under the Credit Facility was approximately $11,959,192.67, exclusive of additional pre-petition interest, attorneys' fees, costs, and expenses and other costs chargeable under the Credit Agreement.

In addition to the Credit Facility, Debtor also obtained pre-petition equipment financing from Liberty Bank. On August 26, 2008, the Debtor executed a Promissory Note (the "Liberty Note") in the original principal amount of $4,500,000 payable to Liberty Bank of Arkansas ("Liberty"). To secure the repayment of the Liberty Note, the Debtor entered into a Commercial Security Agreement dated August 26, 2009, granting Liberty a security interest in all of Debtor's equipment and various motor vehicles together with accessions thereto and proceeds thereof. As of the Petition Date, the amount owed under the Liberty Note was approximately $3,059,218.49.

The Debtor also financed the acquisition of certain equipment pursuant to Master Lease Agreements with Citicorp Vendor Finance, Inc., later by CIT Technology Financing Services, Inc. ("CIT") and Banc of America Leasing & Capital LLC ("BOA"). The Debtor's records reflect that CIT was owed $55,179.33 as of the Petition Date; however, CIT filed a proof of claim in the amount of $42,614.33. The Debtor's records reflect that as of the Petition Date, BOA was owed the sum of $288,335.42, by virtue of the Schedule to the Master Lease Agreement, dated August 3, 2006, and the sum of $162,486.49 for the equipment financed pursuant to the Schedule to the Master Lease Agreement dated November 27, 2006.

As of the Petition Date, the equity security holders in the Debtor were the Dwain A. Newman Trust (60.57%), the Dwain Newman Family Irrevocable Trust No. 1 (18.16%), the

Glenda Newman Family Irrevocable Trust No. 2 (19.34%) and the Glenda R Newman Trust (1.93%).

## B. General Overview of Post-Filing Activity

After the Petition Date, National Home Centers attempted to continue business operations as usual. The Debtor believed that it would be permitted to use cash collateral in an amount which would provide sufficient funds to maintain normal operations as it scaled down its business operations. However, despite the lenders' limited agreement for the use of cash collateral, substantially all of Debtor's trade vendors refused to provide any post-petition credit to Debtor and instead demanded payment in advance. In addition, Debtor's lenders threatened to withdraw consent to use cash collateral and placed increasing pressure on the Debtor to sell substantially all of its business assets. In the meantime, there was no clear indication that the building supply industry would rebound within a reasonable time or that the Debtor would be able to restructure its financial affairs sufficiently to continue operations.

### 1. Administrative and Financing Matters

#### a) Trustee and Committee Appointments

Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtor continues to operate and manage its business as a debtor-in-possession. The Unsecured Creditors Committee was appointed by the United States Trustee on December 29, 2009.

#### b) § 341(a) First Meeting of Creditors

On March 8, 2010, the United States Trustee's Office conducted the first meeting of creditors, pursuant to § 341(a) of the Bankruptcy Code, in Fayetteville, Arkansas.

#### c) Debtor's Counsel and Other Professionals

With the approval of the Court, the Debtor employed the law firm of Wright, Lindsey & Jennings, LLP as its attorneys to represent it as debtor-in-possession on the terms stated in the related employment application and the Order of the Court approving such employment. The Court also approved employment of various other law firms to assist in certain collection matters. The Debtor also received Court approval to retain CRG Partners Group LLC as its financial advisors and the Court has approved the appointment of various real estate professionals to market specific properties.

     d)  Committee's Professionals

With the approval of the Court, the Committee employed the law firms of Miller, Canfield, Paddock & Stone, PLC and Nixon Law Firm as its counsel and local counsel, respectively.

     e)  Post-Petition Financing

On December 8, 2009, the Debtor filed the Cash Collateral Motion seeking immediate authorization to use the cash collateral of JPMorgan on behalf of itself and other lenders in order to meet the Debtor's ordinary operating expenses, including the payment of vendors, the sales and use taxes, payroll, management, and other general administrative expenses as more fully set forth in the budget submitted by the Debtor. Subsequently, First through Fifth Interim Cash Collateral Orders were entered permitting Debtor to use cash collateral. Upon the sale of substantially all of the Debtor's assets on April 5, 2010, the Credit Facility was paid in full and the Debtor's remaining cash was no longer subject to an interest of an entity other than the estate of the Debtor.

f)   §503(b)(9) Claims - Bar Date and Procedures

On February 12, 2010, the Court entered an order setting procedures with regard to claims for allowance of administrative expenses arising under 11 U.S.C. § 503(b)(9) ("§503(b)(9) Claims"), which included a deadline of March 19, 2010 for filing such claims and the requirement that the claims be asserted either by a motion for allowance or by a special §503(b)(9) Claim Request Form, among other procedures.

Since that time the Court has entered additional procedural orders with regard to the §503(b)(9) Claims.  A total of one hundred thirty (130) § 503(b)(9) Claims were filed prior to the §503(b)(9) Claims Bar Date.  On April 9, 2010, Debtor filed its initial §503(b)(9) Claims Report and requested that the Court establish further §503(b)(9) Claims procedures.  On May 6, 2010, the Court entered an order establishing the certain procedures for approval and objections to § 503(b)(9) Claims and provided that no payment of allowed § 503(b)(9) Claims shall be made pending subsequent order of this Court or confirmation of a plan of reorganization.  With one exception all §503(b)(9) claims have been resolved.  There have been a total of  approximately ninety §503(b)(9) claims allowed by the Court in the total amount of $2,531,790.68.   The status of the §503(b)(9) claim filed by The Buying Source remains unresolved.  The orders entered approving the §503(b)(9) claims provide that the Debtor reserved all rights of setoff or recoupment that may exist relative to the §503(b)(9) Claims for any reason, including claims for setoff/recoupment arising out of or related to preferences, post-petition pre-payments, or other claims Debtor may have against the §503(b)(9) Claimants.

g)   Bar Date – Unsecured Claims

By Order entered July 26, 2010, the Court set September 2, 2010, as the Claims Bar

Date for general unsecured claims – the deadline by which all proofs of claim for unscheduled

debts or for debts scheduled as disputed, contingent, or unliquidated had to be filed with the

Clerk of the Bankruptcy Court.

The Court also ordered that all parties holding claims arising from, or as a consequence

of, rejection of executory contracts or unexpired leases to file their proofs of claims on or

before the later of (a) 30 days after entry of the order rejecting said contract or lease or (b) the

Claims Bar Date.   For unexpired leases rejected as a matter of law pursuant to §365(d)(4) of

the Bankruptcy Code and those contracts or leases deemed rejected by the Plan, the deadline

for filing a claim is set by the Plan to be 30 days from the Confirmation Date.   Should the

Debtor amend its schedules in the future to change the amount of any claim or change a claim

to disputed, contingent, or unliquidated, the Plan provides that the holder of such claim shall

have 30 days from service of notice of the change to file a proof of claim.

h)   Rejection of Executory Contracts

As of the Petition Date, the Debtor leased non-residential commercial real property for

its store locations and was a party to a number of other executory contracts.   Several of the

leases and other executory contracts were assumed and assigned pursuant to the order

approving the sale entered April 5, 2010.   Throughout the course of this case, the remaining

leases have been rejected. The Debtor is not aware of any unexpired leases or executory

contracts that have not been rejected. To the extent there are any, they will be deemed rejected

pursuant to the Plan.

### 2. Asset Sales and Causes of Action

    a) Asset Sales.

The Debtor has liquidated substantially all of its tangible assets throughout the course of the Chapter 11 Case, both in the ordinary course of business through continued sales of inventory through its stores and pursuant to Court-approved sales.

Pursuant to the terms and conditions of the Fourth Joint Stipulation and Agreed Interim Order Authorizing the Use of Cash Collateral, the Debtor filed its Motion to Approve Bid and Sales Procedures and Notice of Hearing and Opportunity to Object ("Bid Procedures Motion") on January 19, 2010. On March 1, 2010, the Bankruptcy Court approved procedures for the sale of substantially all of Debtor's assets, free and clear of all liens, claims, encumbrances, and other interests, with the liens, claims, encumbrances, and other interests to attach to the sales proceeds and resulting in payment at closing of all of indebtedness secured by the assets sold.  On February 26, 2010, the Debtor filed a motion for approval of a sale of substantially all of Debtor's assets ("Sale Motion") which sought approval of the Asset Purchase Agreement ("APA") the Debtor entered into with Stock Building Supply Holdings, LLC ("Purchaser"). On April 5, 2010, the Bankruptcy Court entered an order approving the Sale Motion ("Sale Order") and the sale closed that same day for a purchase price of $15,000,000.

A portion of the proceeds from the sale of the assets totaling $2,427,809 are held in the Purchase Price Escrow Account.  These funds have not been released to the Debtor because on April 23, 2010, the Purchaser, pursuant to Section 3.2(ii) of the APA, provided the Debtor with its Notice of Disagreement with respect to the amount of Current Assets on the Closing Balance Sheet.  The Debtor does not believe the Purchaser's disagreement has merit and pursuant to the APA, Debtor and Purchaser are in the process of selecting the accounting firm

of Grant Thornton to review and resolve the dispute. Without prior notice to Debtor, and without any consultation with the Debtor's accounting personnel who have knowledge of the relevant issues, the Unsecured Creditor Committee has contacted Purchaser and reportedly agreed to pay the Purchaser $642,000 to settle the purchase price escrow issue. Debtor does not believe that $642,000 (that otherwise would be paid to creditors) should be paid to the Purchaser solely to obtain a prompt settlement.

Debtor is now in the process of liquidating its remaining assets. Debtor owns two parcels of real property located at 1003 Interstate Drive and 304 West Main Street in Clarksville, Arkansas (the "Clarksville Real Property"). On September 22, 2010 Debtor filed a motion for approval of the sale of the Interstate Drive property for $500,000.00. Debtor is continuing to market the 304 West Main Street property.

### 3.  Causes of Action.

The Debtor is now in the process of liquidating its Causes of Action assets, including preference claims under §547 of the Bankruptcy Code. In addition, since the petition date many of the Debtor's vendors required advance payments for inventory shipments. When Debtor ceased operations at the time of the April 5, 2010 sale, it determined that there were a number of vendors holding payments for inventory which had not been shipped. Debtor is in the process of reconciling and collecting overpayments from those vendors.

## IV.  FINANCIAL STATEMENTS AND INFORMATION

Pursuant to the Bankruptcy Rules and the requirements of the United States Trustee's Office, the Debtor filed complete Schedules of Assets and Liabilities and Statements of Affairs as of the Petition Date on January 25, 2010, as well as Monthly Operating Reports for each month since the Petition Date. Debtor's most recent Monthly Operating Report for the month

ended September 30, 2010 is attached as Exhibit B.  In addition to the information provided herein, the Schedules, Statements and Monthly Operating Reports may be consulted and inspected by all interested Persons.  Copies of these and any other filings in this Chapter 11 Case may be obtained electronically by those authorized to participate in the PACER program by accessing the Court's website, http://www.arb.uscourts.gov, or by writing to the Debtor's Counsel WRIGHT, LINDSEY & JENNINGS LLP, Attn:  Celeste Davis, Paralegal,  200 West Capitol Avenue, Suite 2300, Little Rock, AR  72201.   A fee will be charged for copies.

### A. Debtor's Assets

#### 1.  Real Property

The only real property owned by the Debtor is the Clarksville Real Property.  On September 22, 2010, Debtor filed a motion for approval of the sale of the Interstate Drive property for $500,000.00.   Debtor is continuing to market the 304 West Main Street property. If a buyer has not been located by mid-2011, the Debtor will consider other alternatives.

#### 2.  Personal Property

As of October 20, 2010, the Debtor has the following personal property:

a)  Cash.   The Debtor holds unencumbered cash in the amount of $1,694,132 in its operating account.

b)  Purchase Price Escrow.  A portion of the proceeds from the sale of the assets totaling $2,427,809 are held in the Purchase Price Escrow Account.  These proceeds are subject to a dispute with Purchaser.

c)  Tangible Assets.  The only tangible asset still owned by the Debtor is a Sun Tracker Pontoon Boat. The total liquidation value of all of this property is estimated to be between $5,500 and $12,000.

d)  Other Deposits/Retainers. The Debtor's professionals, Wright, Lindsey & Jennings LLP together hold a retainer of $50,000 paid by the Debtor pre-petition. The Debtor will apply these funds to fees payable to these professionals pursuant to their final fee applications after the Effective Date. Other professionals also may continue to hold deposits in an aggregate amount less than $10,000. Any funds in excess of the professionals' fees will be returned to the Debtor and used to pay other expenses. Debtor estimates that it also has other deposits previously made in the ordinary course of its business which the Debtor is actively seeking to recover.

e)  Cash Surrender Value of Insurance Policy. There are two life insurance policies with Conseco Life Insurance Company insuring the life of Dwain A. Newman in which National Home Centers, Inc. has an economic interest. The first policy is owned by the Dwain A. Newman Life Insurance Trust and has a death benefit of $1,650,000. This policy is associated with a collateral assignment split-dollar agreement between the Trust and the Company, which specifies that the Company will be reimbursed for cumulative premiums which it has advanced (in the amount of $454,025). The agreement also provides that the Company would be entitled to policy's cash surrender value, in the current amount of $418,512, in the event of termination of the policy.

The second policy, with a death benefit of $1,550,000, is owned by National Home Centers. $1 million of the policy's death benefit collateralizes a loan between The Newman Family LLC and Arvest Bank. The policy's cash surrender value amounted to $280,370 as of April 15, 2010.

The Company's life insurance asset in the amount of $636,027 reflects the amounts expected to be realized based on cumulative premiums and cash surrender value indicated

above, less a reserve amount for estimated declines in policy values due to insurance costs charged against policy values.

### f)  Causes of Action

The Plan retains and reserves all Causes of Action, including Avoidance Actions, for pursuit or abandonment by the Debtor after Confirmation, within the Debtor's or Dissolution Agent's sole discretion. All Causes of Action, including Avoidance Actions, are discussed and described below.

Known Avoidance Actions include preference claims pursuant to section 547, claims for turnover of funds payable to the estate (e.g., deposits and overpayment credits) pursuant to section 542, claims for avoidance of prepetition overpayments, including as fraudulent transfers pursuant to section 548, and claims for avoidance of post-petition overpayments as unauthorized post-petition transfers pursuant to section 549 of the Bankruptcy Code.

The Debtor has completed an initial preference analysis for all vendors receiving more than $75,000.00 in payments during the 90 days preceding the petition date. These vendors received approximately $14,766,607 in payments during the preference period. The Debtor is actively pursuing collection of post-petition overpayments or credits due from its vendors. The Debtor believes that approximately $128,000 in overpayments remain to be collected.

### B.  Creditors' Claims

ALL STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS ARE ESTIMATES BASED ON INFORMATION CURRENTLY AVAILABLE TO THE DEBTOR AND ARE NOT REPRESENTATIONS THAT SUCH AMOUNTS WILL ULTIMATELY PROVE CORRECT.

1.      **Secured Claims**

All secured claims been paid in full from the sales proceeds of Debtor's assets.

2.      **Administrative Expense Claims**

The following liabilities are the estimated Administrative Expense Claims in various

categories in accordance with sections 503 and 507 of the Code, of which the Debtor is

currently aware:

a)  § 507(a)(2) Administrative Claims

During the course of this Case, the Debtor has generally remained current with its post-

petition operating expenses. Between now and the Effective Date, the Debtor expects to pay

the on-going expenses arising from the operation of its business as they come due.

b)  § 503(b)(9) Claims

Pursuant to § 503(b)(9) of the Bankruptcy Code, the value of any goods received by the

debtor within 20 days before the Petition Date in the ordinary course of business for which the

creditor was not paid are an administrative expense ("§503(b)(9) Claims"). As discussed

above, the Court set a deadline of March 19, 2010 for creditors to file §503(b)(9) Claims

against the Debtor, and the Court established other procedures and placed additional conditions

on allowance.  Excluding duplicate and amended claims, approximately 130 §503(b)(9) Claims

were filed seeking payment of more than $4.5 million.   There have been a total of

approximately ninety §503(b)(9) claims allowed by the Court in the total amount of

$2,531,790.68.   The status of a §503(b)(9) claim filed by The Buying Source has not been

resolved at this time. All other §503(b)(9) claims have been disallowed.

c)    Professional Fees and Expenses

The fees and expenses of the Debtor's and the Committee's legal counsel, financial advisors, accountants and other professional persons employed during the case with Court approval are treated as Administrative Expenses. As of September 30, 2010, Wright, Lindsey & Jennings LLP, as legal counsel to the Debtor, has been awarded interim compensation in the amount of $570,248.5 and reimbursement of expenses totaling $32,810.65. CRG as financial advisor to the Debtor, has been awarded interim compensation in the amount of $609,899.75 and reimbursement of expenses in the amount of $45,609.72. (CRG is no longer performing services for Debtor.) Counsel for the Creditor's Committee has been awarded fees and reimbursement of expenses totaling $207,014.87. All professional fees approved by the Court have been paid.

### 3. Priority Claims

The following liabilities are the estimated Priority Claims in various Classes in accordance with sections 507 of the Code, of which the Debtor is currently aware:

a)    § 507(a)(4) and (5) Employee Claims

Debtor is not aware of any significant claims entitled to priority under 11 U.S.C. § 507(a)(5). Debtor's records reflect that its former employees have claims in the amount of $236,858 for accrued, but unpaid, vacation pay as of the Petition Date under §507(a)(4).

b)    §507(a)(8) Tax Claims.

At or near the commencement of this Chapter 11 Case, the Court granted the Debtor permission to pay all pre-petition sales, use and other trust fund taxes, and Debtor paid same in

the ordinary course of its business. Debtor's records reflect accrued pre-petition personal property taxes in the amount of $316,381.

        c) Other Priority Claims. Also, near the commencement of this Chapter 11 Case, the Court granted the Debtor permission to honor pre-petition deposits by its customers in the ordinary course of its business. Debtor believes that there may be claims for pre-petition deposits by its customers under §507(a)(7). Debtor believes that the amount of pre-petition deposit claims would be less than $15,000. Debtor is not aware of any other claims entitled to priority pursuant to 11 U.S.C. §507.

### 5. Unsecured Claims Without Priority

Debtor identified in its Schedules non-priority, unsecured claims in the total amount of $ 10,514.918.21.  As of October 8, 2010, unsecured claims totaling $6,674,144.50 have been filed against the Debtor. There is significant duplication between the general unsecured claims and §503(b)(9) claims. The Claims Bar Date was September 2, 2010.

The Debtor has preliminarily compared filed unsecured claims with scheduled unsecured claims and with filed 503(b)(9) Claims. Based on this preliminary review, the Debtor estimates the range of Allowed Unsecured Claims against the Debtor to be between $7,500,000 and $10,000,000.

## V.    SUMMARY OF THE PLAN

The Plan proposes that the remaining assets of the Debtor will be liquidated and the proceeds will be distributed to the Creditors in accordance with the Plan and the Bankruptcy Code.

**THE FOLLOWING DESCRIPTIONS OF TREATMENT OF CLAIMS AND OTHER PROVISIONS OF THE PLAN ARE INFORMATIONAL ONLY. CREDITORS AND INTEREST HOLDERS SHOULD REFER TO THE PLAN FOR SPECIFIC**

**TERMS.  TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE INFORMATION BELOW AND THE TERMS OF THE PLAN, THE PLAN CONTROLS AND, ONCE CONFIRMED, IS BINDING.**

### A.  Classification of Claims and Interests

The Plan designates the following Classes of Claims and Interests:

1.  <u>Class 1 Claims:</u> Class 1 consists of Allowed Secured Claims.  Debtor is not aware that any such claims exist, except to the extent of any rights of set off pursuant to 11 U.S.C. §553.

2.  <u>Class 2 Claims:</u> Class 2 consists of Allowed Priority Employee Claims arising under sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code.

3.  <u>Class 3 Claims</u>  Class 3 consists of Allowed Priority Deposit Claims arising under section 507(a)(7) of the Bankruptcy Code.

4.  <u>Class 4 Claims</u>:  Class 4 consists of Priority Tax Claims.

5.  <u>Class 5 Claims:</u> Class 5 consists of Allowed Unsecured Claims.

6.  <u>Class 6 Claims:</u>  Class 6 consists of Claims determined to be Allowed § 503(b)(9) Claims.

7.  <u>Class 7 Claims:</u> Class 7 consists of all Allowed Interests in the Debtor.

All classes are impaired under the Plan.

### B.  Administrative Expenses

Under the plan, Debtor or the Dissolution Agent will have the right to pay Administrative Expenses in the ordinary course of business prior to and for a period of up to the Effective Date. Any person or entity asserting that Debtor owes it an Administrative Expense for services or product provided to the Debtor from the Petition Date through the Confirmation Date that has not been paid as of the end of this period must file and serve a

motion or application for allowance of such expense in accordance with 11 U.S.C.§ 503(a) no later than thirty (30) days of the Effective Dates, or that Administrative Expense shall be deemed disallowed. Payment of any such expense without interest shall be made promptly after obtaining a Final Order resolving the motion and determining the appropriate amount of the Administrative Expense. Any request for payment of Administrative Expense made by proof of claim rather than by motion or application shall be deemed disallowed, unless Debtor or Dissolution Agent in their sole discretion voluntarily decide to honor the request made by proof of claim.

### 1.   §503(b)(9) Claims

After reserving sufficient Cash to pay in full Administrative Expenses and Post Confirmation Date Expenses and subject to the provisions of Section 9.12 of the Plan, Allowed §503(b)(9) Claims will be paid in full without interest on the Effective Date or within ten (10) days of the entry of a Final Order establishing the Allowed §503(b)(9) Claim if such date is after the Effective Date.  In the event the Dissolution Agent lacks sufficient Cash to pay all Allowed § 503(b)(9) Claims in full on that date, the Plan provides that the Dissolution Agent pay the Allowed §503(b)(9) Claims their pro rata share of Cash available for distribution until all Allowed §503(b)(9) Claims are paid in full.  However, the Dissolution Agent shall make a partial distribution on account of the §503(b)(9) Claims in an amount equal to at least one million dollars ($1,000,000) on the Effective Date.

### 2.   Professionals

The Plan provides that fees and expenses of professionals employed pursuant to §327 of the Bankruptcy Code incurred prior to the Effective Date shall be paid upon allowance by

Final Order. Final fee applications must be filed by no later than thirty (30) days after the Effective Date of the Plan.

### C. Treatment of Secured Claims

In the event that there are Allowed Secured Claims, the Plan provides that at the option of the Debtor or Dissolution Agent, each such Allowed Secured Claim shall either be (i) paid in cash the amount of its Allowed Secured Claim on the Effective Date or, if Disputed, upon obtaining a Final Order determining the amount of its Allowed Secured Claim against Debtor, or at Debtor's option (ii) the collateral in which the Secured Creditor has a perfected security interest shall be surrendered to the Secured Creditor in complete satisfaction of its Allowed Class 1 Claim.

### D. Treatment of Priority Claims other than Priority Tax Claims.

#### 1.    Priority Employee Claims.

After reserving sufficient cash to pay administrative expenses, § 503(b)(9) Claims and Post Confirmation Date Expenses, the Plan provides that all Allowed Priority Employee Claims under §507(a)(4) and (5) will be paid in full without interest on or before Effective Date.  In the event the Dissolution Agent lacks sufficient Cash to pay Allowed Priority Employee Claims in full on that date, the holders of Allowed Priority Employee Claims shall receive their pro rata share of Cash available for distribution until the Allowed Priority Employee Claims are paid in full.

#### 2.  Priority Deposit Claims.

After reserving sufficient Cash to pay in full Administrative Expenses, § 503(b)(9) Claims, Post Confirmation Date Expenses, and Allowed Priority Employee Claims, all Allowed Priority Deposit Claims in Class 3 shall be paid in full without interest on or before

Effective Date. In the event the Dissolution Agent lacks sufficient Cash to pay Allowed Priority Deposit Claims in full on that date, the holders of Allowed Priority Deposit Claims shall receive their pro rata share of Cash available for distribution until the Allowed Priority Deposit Claims are paid in full.

### 3. Priority Tax Claims.

After reserving sufficient Cash to pay in full Administrative Expenses, § 503(b)(9) Claims, and Post-Confirmation Date Expenses, Priority Employee Claims and Priority Deposit Claims, the Plan provides that all Allowed Priority Tax Claims will be paid in full on the later of the Effective Date, the entry of a Final Order allowing any disputed Priority Tax Claim, and the date on which the Dissolution Agent determines that he has sufficient Cash to pay these claims provided however, that all Allowed Priority Tax Claims must be paid in full over a period ending not later than five years after Petition Date. Notwithstanding anything herein to the contrary, the term paid in full shall include interest from the Confirmation Date at the Federal Post Judgment Rate with respect to Allowed Priority Tax Claims not paid on either the Effective Date or upon entry of a Final Order allowing such claims. Additionally, the Debtor and Dissolution Agent may in their sole discretion choose to make partial payments on Allowed Priority Tax Claims on a pro rata basis. No payment on account of any penalty related to or arising out of any Priority Tax Claims will be paid and any claim for such penalty shall be deemed waived, denied and disallowed upon Confirmation of this Plan.

### E. Treatment of Unsecured Claims.

Under the plan, each holder of an Allowed Unsecured Claim will periodically receive its pro rata share of the Cash available for distribution to this Class after reserving sufficient cash to pay in full Administrative Expenses, § 503(b)(9) Claims, Post-Confirmation Date

Expenses,  Priority Employee Claims, Priority Deposit Claims and Priority Tax Claims. Holders of Class 5 Claims shall be entitled to receive such periodic distributions until Allowed Unsecured Claims in Class 5 are paid in full, without interest.

### F.  Interest Holders.

Holders of Allowed Interests in the Debtor will not receive any distribution under the Plan, and their interests in the Debtor will be cancelled as of the Effective Date.

### G.  Voting on the Plan,

Classes 1, 2, 3, 4, 5 and 6 are entitled to vote on the Plan.  With respect to any Class of Claims which is impaired and entitled to vote, such Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such Class (excluding Insiders) that vote on the Plan. If any impaired Class of Claims shall fail to accept the Plan in accordance with Bankruptcy Code § 1129(a), the Debtor may request that the Court confirm the Plan in accordance with Bankruptcy Code § 1129(b).

### H.  Counting Votes

If any ballot fails to clearly designate the Class to which it relates, the Debtor shall have the right to make that determination, based on its knowledge of claim and Debtor's business. Any such decision made in good faith shall be final and binding. In order to confirm the Plan, in addition to meeting the other requirements of § 1129 of the Code, at least one impaired Class of creditors must vote in favor of the Plan.

### I.  Means of Execution and Implementation of the Plan

#### 1.  Dissolution Agent.

The Plan provides that the initial Dissolution Agent will be Dwain A. Newman, who currently serves as the Debtor's chief executive officer.  Mr. Newman will receive no compensation for his services.  The Dissolution Agent will serve as the sole director and officer of the Debtor after the Effective Date and will be responsible for implementing the Plan for the benefit of all holders of Allowed Claims and Allowed Interests as provided by the Plan, subject to the continued jurisdiction of the Court.  The Plan authorizes the Dissolution Agent to hire Debtor's former accounting employees as independent contractors on an as needed basis until Causes of Action are substantially resolved.  It is anticipated that Robert Storment, the Debtor's former Senior Vice President of Accounting will be retained as a contractor and compensated at the rate of $75.00 per hour.  The Dissolution Agent and any retained contractors shall be entitled to be reimbursed for their costs.  The Dissolution Agent may retain counsel and other professionals upon such terms not inconsistent with the Plan as may be agreed by such counsel or other professionals and the Dissolution Agent.   Dwain A. Newman and Robert Storment were both temporarily employed by Purchaser after entry of the Sale Order but there employment by Purchaser has terminated.  Purchaser remains indebted to Mr. Newman for the balance of his one-year salary.

### 2.  Post-Confirmation Date Expenses.

The Debtor or the Dissolution Agent shall also have the right to pay Post-Confirmation Date Expenses in the ordinary course of business.  The Debtor's projects its Post-Confirmation Expenses, other than sales costs, to be approximately $500,000 as compared to approximately $730,000 in a Chapter 7 liquidation as shown on Exhibit C.  A significant portion of this difference is that under the Debtor's Plan, there will be no Trustee's Fees, the Dissolution

Agent is serving without a fee, and Robert Storment will be compensated at $75.00 per hour and is intimately familiar with the Debtor's records.

### 3.   Liquidation of Remaining Assets and Causes of Action.

To the extent that the Clarksville Real Property, any Personal Property, or Causes of Action (including Avoidance Actions) remain in the Debtor's estate as of the Effective Date, the Plan provides that the Dissolution Agent shall expeditiously liquidate such remaining assets. Post-Effective Date sales of the remaining assets shall not require Court approval and shall be sold on terms and conditions acceptable to the Dissolution Agent. The net proceeds from the sale of any remaining assets and the liquidation of any Cause of Action or Avoidance Action shall be distributed in accordance with the terms of the Plan.

The Plan provides that the Debtor retains and reserves all Causes of Action, including Avoidance Actions, for pursuit by the Debtor post-confirmation and the Dissolution Agent after the Effective Date. The Debtor and, after the Effective Date, the Dissolution Agent have broad discretion to pursue, settle or abandon Causes of Action and Avoidance Actions. The Dissolution Agent has full authority and discretion under the Plan to investigate, pursue, settle and collect Causes of Action and Avoidance Actions, without notice or Court approval and notwithstanding Rule 9019. The Dissolution Agent, in his sole discretion, has authority to abandon any remaining asset that has no market value or that he believes is burdensome to the Debtor's estate.

### J.   Distributions under the Plan

The Plan contemplates the distribution of all net proceeds in accordance with the priorities established by the Bankruptcy Code and the Plan and the procedures in the Plan. All net proceeds realized from further liquidation of remaining assets shall be paid in accordance

with the priorities established by the Plan until all Allowed Unsecured Claims are paid in full. Distributions to holders of Allowed §503(b)(9) Claims will commence on the Effective Date of the Plan.  If on the Effective Date of the Plan, Debtor does not have cash available to pay holders of Allowed §503(b)(9) Claims in full, those claimants will receive a pro rata share on account of each §503(b)(9) claim of a distribution of at least one million dollars ($1,000,000) on the Effective Date.

The Plan sets no specific date on which the Dissolution Agent shall make an initial Distribution to the holders of Allowed Unsecured Claims.  The initial distribution will occur promptly upon the Dissolution Agent determining that the Debtor holds Cash in an amount at least $250,000 more than the estimated amount of cash required to pay in full all Administrative Claims, all Priority Claims and anticipated Post-Confirmation Expenses.

### K.   Miscellaneous and General Provisions

The Plan also includes the following miscellaneous and general provisions:

#### 1.   Claim Objections and Disallowance

The Dissolution Agent or any other party in interest may file with the Court, within 120 days after the Effective Date, which date may be extended by Court order, a written objection to the allowance or classification of any Claim or Interest in any Class, which objection shall be served upon the Claimant and other parties in interest. The failure to object to or to examine any Claim or Interest for the purposes of voting on this Plan shall not be deemed a waiver of such party's right to object to, or re-examine the Claim or Interest in whole or in part within the above-described time period.

## 2. Additional Documents

Upon entry of the Confirmation Order, the Debtor, the Dissolution Agent, or such other person as the Court may appoint, shall be authorized to execute all documents reasonably required by the Plan to effectuate the Plan, including, but not limited to, all contracts or other agreements reasonably necessary to effectuate the Plan.

## 3. Quarterly Fees

All fees payable under 28 U.S.C. § 1930 for quarters ending prior to the entry of the Final Decree shall be paid in full.

## 4. Dissolution of Unsecured Creditors Committee.

The Plan provides that on the Effective Date, the Unsecured Creditors Committee shall be dissolved and its members shall be deemed relieved of all of their prior duties and responsibilities and shall be without any further duties, responsibilities and authority in connection with the Chapter 11 Case or the Plan and its implementation. The professionals retained by the Unsecured Creditors Committee and the members thereof will not be entitled to compensation or reimbursement of expenses for any services rendered after the Effective Date. If the Unsecured Creditors Committee so elects, it may designate a person or persons with whom the Dissolution Agent shall confer on a regular basis regarding the on-going administration of the Debtor's estate after the Confirmation Date. The person or persons so designated shall have the right to file any motion on behalf of Class 5 Creditors.   The designated persons shall be entitled to reimbursement of reasonable expenses, including attorney fees as a Post-Confirmation Date Expense, but only in the event such fees are approved by the Court for cause which must include a material benefit to the estate.  Any such

attorney fees and expenses shall be paid by the Dissolution Agent only after all Allowed Claims in Classes 1, 2, 3 and 4 have been paid in full.

The Debtor and the Dissolution Agent will continue to make financial information reasonably available to the Unsecured Creditors Committee, its professionals, or any person or persons designated by the Unsecured Creditors Committee pursuant to the Plan paragraph above. The Debtor and Dissolution Agent will report to the Unsecured Creditors Committee or the designated persons when reasonably requested with regard to winding down the Debtor's operations, liquidating Debtor's Assets, pursuing Causes of Action and distributing Net Proceeds.

### 5. Final Accounting and Case Closing

The Debtor, through the Dissolution Agent, shall be responsible for preparing and filing any required motion and the final accounting necessary to close the Case. The Dissolution Agent will make every effort to file a final accounting and motion for a final decree within 90 days of making the final distribution. This Chapter 11 Case may be closed notwithstanding the pendency of any claims objections, other contested motions, Causes of Action or Avoidance Actions, over which the Court shall retain jurisdiction.

### 6. Destruction of Records

After the Effective Date, the Dissolution Agent shall have the right to destroy or cause to be destroyed records of the Debtor that are determined to no longer be needed; provided, that the Dissolution Agent shall give fifteen (15) days notice of such destruction to any persons designated to act by the Unsecured Creditors Committee and provided that the Dissolution Agent shall not knowingly destroy any records relevant to a possible or pending Cause of

Action, Avoidance Action or Disputed Claim. Any objection to the destruction of such records must be raised as an objection to confirmation of the Plan or shall be deemed to be waived.

### 7. EXCULPATION.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR CONFIRMATION ORDER, THE DEBTOR, ITS OFFICERS AND DIRECTORS, ITS PROFESSIONALS, THE DISSOLUTION AGENT, THE UNSECURED CREDITORS COMMITTEE AND ITS MEMBERS (ACTING IN SUCH CAPACITY) AND PROFESSIONALS SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY PERSON FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN (EXCLUSIVE OF AN ACT CONSTITUTING FRAUD, GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT) IN CONNECTION WITH OR RELATED TO THE THIS CHAPTER 11 CASE, INCLUDING WITHOUT LIMITATION ACTIONS RELATED TO THE FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, ADMINISTRATION, CONFIRMATION OR CONSUMMATION OF THE PLAN, THE DISCLOSURE STATEMENT OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN.

EXCULPATION OF EACH OF THE ABOVE PARTIES IS APPROPRIATE BECAUSE EACH WOULD BE ENTITLED TO INDEMNIFICATION AS AN ADMINISTRATIVE EXPENSE FROM THE DEBTOR FOR ALL ACTIONS TAKEN IN GOOD FAITH IN A MANNER REASONABLY BELIEVED TO BE IN THE BEST INTERESTS OF THE DEBTOR DURING THE COURSE OF THIS CHAPTER 11 CASE.

## 8. INJUNCTION.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, THE PLAN PERMANENTLY ENJOINS ALL PERSONS FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY FOR WHICH ANY PARTY RECEIVED EXCULPATION PURSUANT TO THE PLAN.**

## VI. TAX CONSEQUENCES

The following discussion summarizes certain anticipated federal income tax consequences of implementation of the Plan to holders of Claims and Interests and to the Debtor. It does not address all federal income tax consequences of the Plan nor does it address the state or local income tax or other state or local tax consequences of implementation of the Plan to holders of Claims and Interests or to the Debtor.

The description of the federal income tax consequences of implementing the Plan is based on the Internal Revenue Code of 1986 (the "Tax Code"), the existing Treasury Regulations and Proposed Regulations there under, judicial decisions and current published administrative rulings generally available prior to the date of the filing of the Plan, all of which are subject to change at any time. Any such change may have a retroactive effect. **THE DEBTOR HAS NOT RECEIVED, NOR WILL IT REQUEST, A RULING FROM THE IRS AS TO ANY OF THE TAX CONSEQUENCES OF THE PROPOSED PLAN WITH RESPECT TO HOLDERS OF CLAIMS OR INTERESTS. NO ASSURANCE IS OR CAN BE GIVEN THAT THE IRS WILL CONCUR WITH, NOR IS THE IRS BOUND**

**BY, THIS DISCUSSION**. The Debtor has not obtained an opinion of counsel with respect to any of these matters. The discussion below is general in nature and is not directed to the specific tax situation of any particular interested taxpayer. **FOR THESE REASONS, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN ADVISORS AS TO THE TAX CONSEQUENCES OF IMPLEMENTATION OF THE PLAN TO THEM UNDER APPLICABLE FEDERAL, STATE AND LOCAL TAX LAWS.**

## VII.   LIQUIDATION ANALYSIS

This Plan is a plan of liquidation. To obtain confirmation of the Plan, the Debtor must show that each holder of an impaired Claim or Interest has accepted the Plan, or that each holder will receive or retain under the Plan on account of the Holder's Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Code on said date. Attached as Exhibit C is Debtor's liquidation analysis showing the recovery to creditors in a case under Chapter 7 .   In a Chapter 7 Liquidation, Debtor believes that Holders of Administrative Claims, §503(b)(9) Claims, Priority Employee Claims and Priority Deposit Claims will be paid in full and unsecured creditors will receive an amount equal to approximately $1,660,000.   Under the Debtor's Plan, the Debtor estimates that Holders of Administrative Claims, §503(b)(9) Claims, Priority Employee Claims and Priority Deposit Claims will be paid in full and that the total amount of Cash ultimately available for distribution on account of Allowed Unsecured Claims in Class 5 in accordance with the Plan could be in an amount in excess of $2,000,000.   These projections are estimates only based on

currently available information, and the actual results may vary significantly from the projections.

The Debtor believes that, because of the extensive knowledge of the Dissolution Agent, the agent will collect substantially more from the pursuit of Causes of Action than would be recovered by a Chapter 7 trustee. Since the filing of this Case, the Debtor has taken action to maximize the value of its estate for the benefit of creditors and parties in interest, and the Dissolution Agent will continue to do so post-confirmation.

Under the Plan, after the Effective Date, the Dissolution Agent will understand the nature of, and have actual knowledge of, the relationship with Debtor's customers and vendors. The Dissolution Agent also understands Debtor's accounting systems, both before and after the Petition Date, and Debtor's accounts payable and accounts receivable records. The Dissolution Agent knows where to look for information regarding vendor terms and conditions, and the history of vendor collection efforts relevant to an ordinary course preference defense. Most importantly, the Agent can draw upon knowledge gained from his experience as an employee when Debtor was an operating company. The knowledge and experience of the Agent will enable the Agent, better than any other party, to assert the Causes of Action and to respond to defenses that will be raised. This information and knowledge will continue to be essential to the work remaining to be done in this Chapter 11 Case after the Effective Date. This knowledge of the Debtor's business will maximize the return on Causes of Action and thus generate a greater return to creditors than could be obtained by a Chapter 7 trustee or any other third party.

## VIII.   RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to conversion of this case to one under Chapter 7 of the Code or any other Plan.  The Debtor respectfully urges holders of Claims against the Debtor to accept the Debtor's Plan and to evidence such acceptance by returning their ballots in accordance with the Court Order.

NATIONAL HOME CENTERS, INC.
Debtor in Possession

By:   /s/Dwain A. Newman
Dwain A. Newman, its Chief Executive
Officer

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR  72201
Telephone:  501-371-0808
Fax:         501-376-9442
Email:  ccoleman@wlj.com
         jhenry@wlj.com
         ktucker@wlj.com

By:   _____
Charles T. Coleman (80030)
Judy Simmons Henry (84069)
Kimberly Wood Tucker (83175)
Attorneys for National Home Centers, Inc.